CHRYSLER CORPORATION, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

GENERAL MOTORS CORPORATION,
Petitioner,

v.

Douglas COSTLE, Administrator,
Environmental Protection
Agency, Respondent.

INTERNATIONAL HARVESTER
COMPANY, Petitioner,

v.

Douglas COSTLE, Administrator,
Environmental Protection
Agency, Respondent.

FORD MOTOR COMPANY, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Nos. 76–1569, 76–1575, 76–1576
and 76–1582.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 17, 1978.

Decided April 9, 1979.

Howard P. Willens, Washington, D. C., with whom Deanne C. Siemer and Phillip L. Radoff, Washington, D. C., were on the brief, for petitioner in No. 76–1582.

Patrick M. Raher, Washington, D. C., with whom Victor C. Tomlinson and Connie R. Gale, Detroit, Mich., were on the brief, for petitioner in No. 76–1569.

Reuben L. Hedlund, Chicago, Ill., a member of the bar of the Supreme Court of Illinois, by special leave of court pro hac vice, with whom Laurence H. Levine, Chicago, Ill., and Frazer F. Hilder, Detroit, Mich., were on the brief, for petitioners in Nos. 76–1575 and 76–1576. Edward W. Warren, Washington, D. C., and Hammond E. Chaffetz, Chicago, Ill., also entered an appearance for petitioners in Nos. 76–1575 and 76–1576.

Ronald S. Naveen and Jeffrey O. Cerar, Atty., Environmental Protection Agency, Washington, D. C., with whom James W. Moorman, Acting Asst. Atty. Gen., Dept. of Justice, and G. William Frick, Gen. Counsel, Environmental Protection Agency, Washington, D. C., were on the brief, for respondents. Peter R. Taft, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondents.

Thomas A. Pursley III, Atty., Department of Justice, Washington, D.C., argued for respondent Environmental Protection Agency.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In these cases, petitioners challenge the validity of regulations promulgated for medium and heavy trucks [1] by the Administrator of the Environmental Protection Agency (EPA) purportedly pursuant to the Noise Control Act of 1972.[2] Because of jurisdictional limitations on review of these regulations,[3] we find ourselves unable to rule on the merits of petitioners' arguments save in one respect. That exception is their attack on warranty provisions of the regulations,[4] and these we find to be invalid under the Act.

## I. BACKGROUND

The Noise Control Act of 1972 is another in the series of major congressional efforts to achieve at least a minimum acceptable level of environmental quality. A prominent and integral feature of the Act's regulatory scheme is the promulgation of noise emission standards,[5] a function delegated to the Administrator of the Environmental Protection Agency.[6] The Administrator is required to compile and publish a report identifying those products or classes of products which in his judgment constitute "major sources of noise." [7] It thereafter becomes incumbent upon the Administrator to prescribe regulations covering identified products within four categories when noise emission standards are deemed feasible.[8] The regulations must set standards limiting noise emission from such products, and may erect testing procedures to acquire compliance with the emission standards.[9] With exceptions inapplicable here, distribution of

1. 40 C.F.R. § 205 (1977). Citation of regulations hereinafter is to that source and version, with a notation of any subsequent revision.

2. Noise Control Act of 1972, Pub.L. No. 92–574, 86 Stat. 1234 (1972), 42 U.S.C. §§ 4901 et seq. (1976).

3. Act § 16(a), 42 U.S.C. § 4915(a) (1976).

4. 40 C.F.R. § 205.58–1 (1977).

5. Noise Control Act of 1972, § 2(b), 42 U.S.C. § 4901(b) (1976).

6. Id. § 6(c)(1), 42 U.S.C. § 4905(c)(1) (1976).

7. Id. §§ 5(b)(1), (d), 42 U.S.C. §§ 4904(b)(1), (d) (1976). Other information must also be gathered and published. Id. §§ 5(a), (b)(2), (d), 42 U.S.C. §§ 4904(a), (b)(2), (d) (1976).

8. Id. §§ 6(a)–(c), 42 U.S.C. §§ 4905(a)–(c) (1976)..

9. Id. § 6(c)(1), 42 U.S.C. § 4905(c)(1) (1976).

noncomplying products in interstate commerce is prohibited.[10]

In 1974, responsively to these statutory mandates, the Administrator identified as major noise sources medium and heavy trucks with gross vehicle weight ratings in excess of 10,000 pounds, and proposed detailed regulations dealing with them.[11] The proposals included not only noise emission standards but test methodology, enforcement programs and warranty requirements as well. After rulemaking proceedings, regulations on these subjects became final in 1976.[12]

Timely petitions for review were filed in this court by four major American truck manufacturers.[13] While petitioners do not question the emission standards[14] or the testing procedures[15] thus established, they do assail the enforcement[16] and warranty[17] regulations.[18] The enforcement program permits EPA to inspect and monitor regulated products and required records,[19] to recall noncomplying products,[20] and to put an end to distribution of vehicles by manufacturers disregarding specified regulations.[21] The warranty provisions exact from the manufacturer responsible for production verification of the vehicle[22] a warranty that it was "designed, built and equipped to conform at the time of sale . . . with all applicable U.S. EPA noise control regulations."[23] On both statutory and constitutional grounds, petitioners say these administrative exertions are invalid.

---

**10.** *Id.* §§ 10(a)(1), (b), 42 U.S.C. §§ 4909(a)(1), (b) (1976).

**11.** 39 Fed.Reg. 38338 (1974).

**12.** 41 Fed.Reg. 15538 (1976). These regulations are published as 40 C.F.R. §§ 205.50 *et seq.* (1977).

**13.** Petitioners are Chrysler Corporation, Ford Motor Company, General Motors Corporation and International Harvester Company.

**14.** 40 C.F.R. § 205.52 (1977).

**15.** *Id.* §§ 205.54–205.57 (1977).

**16.** *Id.* §§ 205.4, 205.55–10, 205.57–1(f), 205.59 (1977).

**17.** *Id.* § 205.58–1 (1977).

**18.** Petitioner Chrysler Corporation originally challenged additionally the application of the medium and heavy truck regulations to motor homes. See Brief for Petitioner Chrysler Corporation at 38–40. We have severed that issue for treatment in a separate docket, No. 78–1117, *Chrysler Corp. v. EPA,* consolidated it for consideration on the merits with No. 76–1875, *Recreational Vehicle Indus. Ass'n v. EPA,* and ordered the consolidated litigation to be held in abeyance pending further order of the court.

**19.** When review was sought in this case, 40 C.F.R. § 205.4 (1977) required that a manufacturer subject to regulation under the Act to admit an EPA enforcement officer on 24-hour notice to any facility or site where regulated products were manufactured, assembled or stored, or where tests were performed or required records kept. Notice was unnecessary if entry was demanded pursuant to written authorization of the Assistant Administrator for Enforcement. *Id.* § 205.4(e) (1977). Once inside the facility, the EPA official could inspect the products, their manufacture and assembly, and the required records. *Id.* § 205.-4(c) (1977).

Under revised regulations, finalized in 1978 and designed to bring EPA's enforcement procedures within the requirements laid down in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), "an EPA enforcement officer may enter a facility only upon the consent of the manufacturer unless the enforcement officer first obtains a warrant authorizing such entry." 43 Fed.Reg. 27989 (1978). The revised regulations state that warrants may be obtained *ex parte,* and characterize a manufacturer's refusal to permit a warranted entry as a violation of the Act. *Id.*

**20.** The regulations authorize administrative orders compelling manufacturers to recall and repair or modify noncomplying vehicles. 40 C.F.R. § 205.59 (1977).

**21.** *Id.* §§ 205.4(f), 205.55–10, 205.57–1(f) (1977). The Administrator later revoked § 205.4(f) as unnecessary, asserting that any violation of a manufacturer's duty to allow a warranted entry could be dealt with by exercise of the enforcement powers conferred by § 11 of the Act, 42 U.S.C. § 4910 (1976). 43 Fed.Reg. 27989 (1978).

**22.** Production verification includes yearly testing of sample vehicles, compliance of the test vehicles with applicable standards, and submission of a production verification report. 40 C.F.R. § 205.55–2(b) (1977).

**23.** 40 C.F.R. § 205.58–1(a) (1977).

## II. THE ENFORCEMENT REGULATIONS

■ At the outset, we are confronted with a challenge to our jurisdiction to review the enforcement procedures.[24] The Noise Control Act, in common with other environmental legislation,[25] provides preclusively for direct review of the Administrator's performances in certain instances.[26] Section 16(a), pursuant to which our jurisdiction is invoked, designates the one instance relevant here:

A petition for review of action of the Administrator of the Environmental Protection Agency in promulgating any standard or regulation under section 6, 17, or 18 of this Act . . . may be filed only in the United States Court of Appeals for the District of Columbia Circuit. . . .[27]

Since Sections 17[28] and 18[29] relate respectively to standards for railroads and inter- state motor carriers[30] and therefore are inapplicable to this litigation, we focus our attention on Section 6.

That section calls upon the Administrator to publish for each covered product[31] proposed regulations which "shall include a noise emission standard" meeting enumerated specifications and which

[i]n addition . . . may contain testing procedures necessary to assure compliance with the [applicable] emission standard . . . and may contain provisions respecting instructions of the manufacturer for the maintenance, use, or repair of the product.[32]

Section 6 also establishes time limits for the publication of regulations proposed thereunder,[33] and requires manufacturers to "warrant to the ultimate purchaser" that regulated products are in conformity with the regulations adopted.[34]

---

**24.** The challenger is petitioner Ford Motor Company. A second route, taken by all petitioners—claims of substantive invalidity of the regulations—is the more typical industry approach, which endeavors to safeguard against ambiguity in preclusive review provisions of environmental statutes and the accompanying consequences of failure to seek immediate review if jurisdiction therefor actually exists. See notes 76–77 *infra* and accompanying text.

**25.** See Clean Air Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1705 (1970), 42 U.S.C. § 1857h–5(b) (1976) [hereinafter cited as codified]; Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat. 896 (1972), 33 U.S.C. § 1369(b) (1976) [hereinafter cited as codified]. The Clean Air Act was completely revised in 1977. Clean Air Act Amendments of 1977, Pub.L. No. 95–95, 91 Stat. 685 (1977), 42 U.S.C.A. §§ 7401 *et seq.* (West Supp.1977) [hereinafter cited as codified]. The 1977 version of the Act carries forward the judicial review provision from the 1970 Amendments with several revisions broadening the coverage of the section by designating a greater number of EPA actions as subjects of direct review. *Id.* § 7607(b) (West Supp.1977). The 1977 provision retains, however, the preclusive review restriction of its predecessor. *Id.;* see notes 76–77 *infra* and accompanying text.

**26.** See note 27 *infra.*

**27.** 42 U.S.C. § 4915(a) (1976), in pertinent part reading:

[A] petition for review of action of the Administrator of the Environmental Protection Agency in promulgating any standard or regulation under section [6, 17, or 18] of this title . . . may be filed only in the United States Court of Appeals for the District of Columbia Circuit . . . . Any such petition shall be filed within ninety days from the date of such promulgation or after such date if such petition is based solely on grounds arising after such ninetieth day. Action of [the] Administrator with respect to which review could have been obtained under this subsection shall not be subject to judicial review in civil or criminal proceedings for enforcement.

**28.** *Id.* § 4916 (1976).

**29.** *Id.* § 4917 (1976).

**30.** Noise emission regulations covering railroads and motor carriers are establishable by the Administrator conjunctively with the Secretary of Transportation.

**31.** Noise Control Act of 1970, § 6(a)(1), 42 U.S.C. § 4905(a)(1) (1976).

**32.** *Id.* § 6(c)(1), 42 U.S.C. § 4905(c)(1) (1976).

**33.** *Id.* § 6(a)(2), 42 U.S.C. § 4905(a)(2) (1976).

**34.** *Id.* § 6(d), 42 U.S.C. § 4905(d) (1976). Other provisions of Section 6 empower the Administrator to devise emission standards for noise sources beyond those he is required to regulate, *id.* § 6(b), 42 U.S.C. § 4905(b), and define the

Petitioner Ford Motor Company contends that the narrow grant of Section 6 rulemaking authority does not afford a substantive basis for the enforcement regulations, and that resultantly we lack jurisdiction under Section 16(a) to pass on their validity. The Administrator argues, however, that a broad reading of Section 16(a) permits our consideration of these provisions because, he says, they are closely related to regulations that clearly would be authorized by Section 6, and therefore under Section 16(a) are *"action[s] of the Administrator . . . in promulgating* [a] standard or regulation under section 6." [35] We disagree with the Administrator.[36]

The unequivocal language of Section 6 restricts legislative rulemaking to but three subjects: noise emission standards, testing procedures and manufacturers' instruc-

tions.[37] Nothing in the legislative history of Section 6 suggests in any way that additional types of regulations were contemplated.[38] More particularly, there is no indication in either the text or the history of Section 6 that it was meant to confer authority to establish an enforcement process, and additional considerations serve further to negate the possibility that Congress intended enforcement regulations to derive from Section 6.

Other provisions of the Noise Control Act deal overtly with the subject of enforcement.[39] Moreover, the Clean Air Amendments of 1970 [40]—on which the Noise Control Act of 1972 was modeled [41]—expressly, and entirely apart from any general standard-setting or testing provision, licensed entry into a manufacturer's facility.[42] It

---

extent to which federal emission standards preempt state and local regulations, *id.* § 6(e)(1), 42 U.S.C. § 4905(e)(1) (1976).

**35.** *Id.* § 16(a), 42 U.S.C. § 4915(a) (1976) (emphasis added); see Brief for Respondents at 8–9.

**36.** Our decision against jurisdiction is necessarily a determination that the enforcement regulations we decline to review cannot be grounded on Section 6. Whether they are properly based on any other provision of the Act is a question we do not reach. And, of course, reviewable regulations, though resting on Section 6, may nonetheless fail to survive review on the merits. See Part III *infra.*

**37.** Although Section 6 deals with other topics, it *expressly* authorizes legislative rulemaking only on these three subjects. See notes 31–34 *supra* and accompanying text.

**38.** See S.Rep. No. 92–1160, 92d Cong., 2d Sess. 5–7 (1972); H.R.Rep. No. 92–842, 92d Cong., 2d Sess. 13–14, U.S.Code Cong. & Admin.News, p. 4655 (1972).

**39.** See Noise Control Act of 1972, §§ 11–13, 42 U.S.C. §§ 4910–4912 (1976).

**40.** 42 U.S.C. §§ 1857 *et seq.* (1976). This Act was completely revised in 1977. See note 25 *supra.*

**41.** As Senator Tunney, one of the Act's sponsors, explained:

The House amendment provides for a number of amendments . . . based on the Clean Air Amendments of 1970. The use of these precedents from the Clean Air Act

should be valuable not only for consistency in environmental law and ease of interpretation and implementation but to expedite approval of this legislation in both the Senate and the House.

118 Cong.Rec. 37318, 92d Cong., 2d Sess. (1972). The precedents included:

A Federal facilities compliance provision identical to the Clean Air Act; A warranty requirement similar to the Clean Air Act; An enforcement provision similar to the Clean Air Act; A citizen suit provision identical to the Clean Air Act; A records and reports provision similar to the Clean Air Act; A judicial review provision identical to the Clean Air Act.

*Id.*

**42.** Clean Air Amendments of 1970, 42 U.S.C. § 1857f–5(c) (1976). This provision was carried forward unchanged in the Clean Air Amendments of 1977, 42 U.S.C.A. § 7525(c) (West Supp.1977). See also Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1318(a) (B) (1976); Safe Drinking Water Act, Pub.L. No. 93–523, § 2(a), 88 Stat. 1660 (1974), 42 U.S.C. § 300j–4(b) (1976) [hereinafter cited as codified]; Consumer Product Safety Act, Pub.L. No. 92–573, § 16, 86 Stat. 1207 (1972), 15 U.S.C. § 2065 (1976) [hereinafter cited as codified]; and National Traffic and Motor Vehicle Safety Act, Pub.L. No. 93–492, tit. I, § 104(a)(2), 88 Stat. 1478 (1974), 15 U.S.C. § 1401 (1976) [hereinafter cited as codified]. Moreover, Clean Air Act has an express provision for recall orders. 42 U.S.C. § 1857f–5a(c)(1) (1976). See also National Traffic and Motor Vehicle Safety Act, 15 U.S.C. §§ 1412–1417 (1976); Consumer Product Safety Act, *id.* § 2064 (1976).

seems inconceivable that Congress would have been ever so clear in the one instance but would leave the authority to be sought between the lines in a closely related statute subsequently enacted. To boot, Section 6 does not lend itself to so broad an interpretation that enforcement regulations would be encompassed, for it lacks a grant of general rulemaking power[43]—a grant that is explicit in other environmental statutes administered by EPA.[44] Thus the plain language of Section 6, viewed in the context of the Act, its legislative history and a comparison of its provisions with those of other environmental enactments, would authorize promulgation of legislative regulations on no more than noise emission standards, testing procedures and manufacturers' instructions. Because EPA's enforcement regulations—which include provisions for entry and inspection, recall and stopped deliveries—do not fit within any of these categories, they would not appear to be "standard[s] or regulation[s] under section 6 . . . of [the] Act" within Section 16(a) review jurisdiction.[45]

In support of the claim that under the latter section we may nevertheless examine the enforcement procedures as "action[s] of the Administrator . . . in promulgat-

ing" Section 6 regulations,[46] the Administrator cites the legislative history and case law on nearly identical review provisions found in the Clean Air Amendments of 1970[47] and the Federal Water Pollution Control Act Amendments of 1972,[48] as well as policy arguments weighing in favor of immediate review.[49] Nothing to which we are thus referred convinces us, however, that Section 16(a) gives us the jurisdiction the Administrator would have us exercise.[50]

We turn first to judicial interpretations of similar review provisions in other environmental statutes. Section 509(b)(1) of the Federal Water Pollution Control Act allows "[r]eview of the Administrator's action . . . in approving or promulgating any effluent limitation or other limitation under Section 301, 302, or 306" in federal courts of appeals.[51] The Administrator contends that this language has been held to permit direct review of Section 304 effluent guidelines and urges us to give Section 16(a) a similar construction. An examination of the Water Act cases yields the sounder view that jurisdiction to review under Section 509(b)(1) depends upon whether the Administrator acted under Section 301, not on an exaggerated reading of its review grant.[52] In *E.I. Du Pont De*

---

43. Although the Noise Control Act of 1972 invests the Secretary of the Treasury, *id.* § 9, 42 U.S.C. § 4908 (1976), and the Secretary of Transportation, *id.* §§ 17(b), 18(b), 42 U.S.C. §§ 4916(b), 4917(b) (1976), with broad rulemaking power, the same legislation omits a comparable grant to the Administrator.

44. See Clean Air Amendments of 1970, 42 U.S.C. § 1857g(a) (1976). This provision was carried forward unchanged in the Clean Air Amendments of 1977, 42 U.S.C.A. § 7601(a)(1) (West Supp.1977). See also Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1361(a) (1976).

45. See text *supra* at note 27.

46. See text *supra* at note 27.

47. 42 U.S.C. §§ 1857 *et seq.* (1976). This Act was completely revised in 1977. See note 25 *supra*.

48. 33 U.S.C. §§ 1251 *et seq.* (1976).

49. See Brief for Respondents at 9–16.

50. Not even the Administrator contends that a broad reading of § 6 alone encompasses the enforcement regulations. See Brief for Respondents at 6–9.

51. 33 U.S.C. § 1369(b) (1976).

52. *See American Paper Inst. v. Train,* 177 U.S. App.D.C. 181, 189, 543 F.2d 328, 336 (1976) ("[b]ecause Section 509 makes no mention of judicial review of Section 304 guidelines, Section 509 will not apply and review is not lodged exclusively in this court unless we determine that the regulations published by EPA are effluent limitations guidelines under Sections 301 and 304"); *American Frozen Food Inst. v. Train,* 176 U.S.App.D.C. 105, 122–127, 539 F.2d 107, 124–129 (1976) (finding jurisdiction because the Administrator acted pursuant to Section 301); *Hooker Chem. & Plastics Corp. v. Train,* 537 F.2d 620, 624 (2d Cir. 1976) ("[t]he status of the contested regulations . . . under § 301 is the jurisdictional linchpin"); *CPC Int'l, Inc. v. Train,* 515 F.2d 1032, 1037 (8th Cir. 1975) (finding no jurisdiction to directly review effluent standards because they were not promulgated pursuant to § 301).

*Nemours & Co. v. Train,*[53] the Supreme Court recently approved this approach, first determining that effluent limitations for existing point sources had been promulgated under Section 301,[54] and then concluding that therefore the plain wording of Section 509(b)(1) established review jurisdiction.[55] Very significantly, the Court noted that

[i]f EPA is correct that its regulations are 'effluent limitation[s] under section 301' the regulations are directly reviewable in the Court of Appeals. If industry is correct that the regulations can only be considered § 304 guidelines, suit to review the regulations could probably be brought only in the District Court, if anywhere.[56]

This court had previously taken the same tack in exploring its jurisdiction to review actions of the Administrator pursuant to Section 307(b)(1) of the Clean Air Amendments of 1970.[57] In *District of Columbia v. Train*[58] we stated:

Section 307(b)(1) grants exclusive jurisdiction to an appropriate court of appeals to hear challenges to a limited class of actions taken by the Administrator. By its terms, the statute allows review here only if the Administrator's actions are taken pursuant to Sections 110, 111(d), or 119(c)(2)(A), (B), or (C) of the Act. If the action is *not* taken pursuant to one of these provisions, a court of appeals is without authority to hear a challenge to it in the first instance.[59]

**53.** 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

**54.** *Id.* at 124, 97 S.Ct. at 973, 51 L.Ed.2d at 215 ("[t]he jurisdictional issue is subsidiary to the critical question whether EPA has the power to issue effluent limitations by regulation").

**55.** *Id.* at 136, 97 S.Ct. at 979, 51 L.Ed.2d at 222.

**56.** *Id.* at 124–125, 97 S.Ct. at 973, 51 L.Ed.2d at 215. The Court, without ruling on the question, also observed:

It has been suggested, however, that even if the EPA regulations are considered to be only § 304 guidelines, the Court of Appeals might still have ancillary jurisdiction to review them because of their close relationship with the § 301 effluent limitations, and because they were developed on the same record as the § 306 standards of performance for new plants, which are directly reviewable in the Court of Appeals.

*Id.* at 125 n.14, 97 S.Ct. at 973 n.14, 51 L.Ed.2d at 215 n.14. In our view, the enforcement regulations under attack in this case bear no such nexus to the § 6 standards and testing procedures as to present the possibility of ancillary jurisdiction to ponder their validity.

**57.** 42 U.S.C. § 1857h–5(b) (1976). This section was revised in 1977. See note 25 *supra.* Interpretation of this provision, however, engendered considerable confusion. See *Utah Power & Light Co. v. EPA,* 180 U.S.App.D.C. 70, 72, 553 F.2d 215, 217 (1977) ("the jurisdictional provisions of the Clean Air Act 'have been sources of periodic confusion' " (footnote omitted)); *District of Columbia v. Train,* 175 U.S. App.D.C. 115, 117, 533 F.2d 1250, 1252 (1976) (accord); *Natural Resources Defense Council, Inc. v. EPA,* 168 U.S.App.D.C. 111, 121, 512 F.2d 1351, 1361 (1975) (concurring and dissenting opinion) ("[w]hile the courts play jurisdic-

tional badminton with these provisions, batting one case back to the District Court under Section 304 while taking another identical one under Section 307, litigants should not be denied substantial rights because of uncertainty created by courts and Congress"). Compare *Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D.D.C.), *aff'd on District Court's opinion,* No. 72–1528 (D.C.Cir. Nov. 1, 1972), *aff'd by an equally divided court,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973) (District Court entertained suit to enjoin the Administrator from approving state Clean Air Act implementation plans without requiring them to provide against significant deterioration of existing clean air areas), with *Anaconda Co. v. Ruckelshaus,* 482 F.2d 1301 (10th Cir. 1973), *rev'g* 352 F.Supp. 697 (D.Colo.1972) (District Court may not entertain suit to enjoin Administrator from promulgating a proposed Clean Air Act rule because the administrative proceedings were not complete and the statute calls for review by the Court of Appeals).

**58.** *Supra* note 57.

**59.** 175 U.S.App.D.C. at 119, 533 F.2d at 1254 (emphasis in original). See *Utah Power & Light Co. v. Train, supra* note 57, 180 U.S.App. D.C. at 72–73, 553 F.2d at 217–218 (accord); *Natural Resources Defense Council, Inc. v. Train,* 171 U.S.App.D.C. 151, 154–155, 519 F.2d 287, 290–291 (1975) (the Administrator's omission of certain substances from published list of toxic substances not reviewable under § 509 of the Federal Water Pollution Control Act Amendments of 1972 because it is not an "action . . . in promulgating any effluent standard [or] prohibition . . . under Section [307]"); *cf. Adamo Wrecking Co. v. United States,* 434 U.S. 275, 284, 98 S.Ct. 566, 572, 54 L.Ed.2d 538, 547–548 (1978) ("[t]he statutory

Far from exhorting an expansive reading of Section 16(a), these decisions confirm our view that the appropriate inquiry is whether the enforcement rules are Section 6 regulations or standards—a question we have already answered in the negative.[60]

To be sure, language similar to "action of the Administrator . . . in promulgating"[61] has occasionally been utilized to better demonstrate our jurisdiction to review an action beyond, but an indispensable forerunner of, one explicitly embraced by an environmental review provision. Those instances are, however, readily distinguishable from the situation before us. In *Natural Resources Defense Council v. Train*,[62] we indicated that although not expressly designated as a subject of review, listing of a substance as toxic under the Federal Water Pollution Control Act would be a reviewable action because it was taken in the course of and was a necessary prerequisite to promulgation of final effluent standards.[63] This suggestion was followed in *National Asphalt Pavement Ass'n v. Train*,[64] in which we held reviewable the designation of a source category as a "significant contributor" under the Clean Air Amendments.[65] It cannot seriously be contended that the enforcement rules in controversy were similarly a step that had to be taken before Section 6 emission standards or testing procedures could be devised. On the contrary, it was only with reference to the latter that the enforcement regulations could be formulated and addressed.[66]

The Administrator's argument that the legislative history of Section 16(a) supports his sweeping interpretation of that provision also is unpersuasive. In fashioning the Noise Control Act, Congress did not articulate any purpose behind Section 16(a) beyond those evident from its text. However, because Section 307(b) of the Clean Air Amendments of 1970[67] served as the model for the review provision of the Noise Control Act,[68] the legislative history of that section is instructive:

> Because many of these administrative actions are national in scope and require even and consistent national application, the provision specifies that any review of such actions shall be in the United States Court of Appeals for the District of Columbia. . . .
>
> In order to maintain the integrity of the time sequences provided throughout the Act, the bill would provide that any review sought must be filed within 30 days of the date of the challenged promulgation or approval.[69]

Thus the congressional objective was "to limit judicial review as to forum and time so as to assure expeditious, authoritative and central judicial resolution of issues which were national in impact and which could hold up the timely accomplishment of the Act's objectives if not settled at the outset."[70] The fact that, simultaneously with stating that aim, Congress expressly authorized review of only some of the Administrator's actions to which the congressional reasoning might apply casts considerable doubt on the Administrator's position

---

scheme supports the conclusion that § 307(b)(2) [of the Clean Air Amendments of 1970], in precluding judicial review of the validity of emission standards, does not relieve the Government of the duty of proving, in a prosecution under § 113(c)(1)(C), that the regulation allegedly violated is an emission standard").

60. See text *supra* at notes 37–44.

61. See text *supra* at note 27.

62. *Supra* note 57.

63. 171 U.S.App.D.C. at 154–155, 519 F.2d at 290–291.

64. 176 U.S.App.D.C. 296, 539 F.2d 775 (1976).

65. *Id.* at 302 n.1, 539 F.2d at 779 n.1.

66. See Brief for Respondents at 9 ("[i]n the absence of a section 6 regulation, [these regulations] would not exist").

67. 42 U.S.C. § 1857h–5(b) (1976). This section was revised in 1977. See note 25 *supra*.

68. See note 41 *supra* and accompanying text.

69. S.Rep. No. 91–1196, 91st Cong., 2d Sess. 41, U.S.Code Cong. & Admin.News, p. 5356 (1970).

70. Brief for Respondents at 9–10.

that Section 16(a) aspires to review of more than the actions enumerated. The purpose Congress declared is much more easily fitted to standards and testing than to an enforcement scheme: Until national standards were finalized, the Act would be completely ineffective, but once standards were in place, uncertainty as to the enforcement scheme would not preclude environmental progress. That Congress viewed timely setting of countrywide standards as more important than timely creation of an enforcement process is apparent from its designation of time limits for accomplishment of the former but not the latter.[71]

A final consideration advanced by the Administrator is the judicial policy of avoiding bifurcation of review wherever possible. That factor comes into play, however, only when the jurisdictional provision reasonably lends itself to differing interpretations.[72] In the legislation before us, Congress specifically listed, by section number, the provisions that are subject to our review. Assuming ambiguity arguably to be discerned in the phrase "action of the Administrator . . . in promulgating,"[73] an application of judicial policy cannot justify an undertaking to overrule the unambiguous enumeration of the provisions reviewable. In this milieu, avoidance of bifurcated review would persuade us to no more than an exercise of ancillary jurisdiction to combine review of Section 6 provisions with indispensable review of other closely allied provisions.[74]

Moreover, even if the legislative history and the policy against bifurcated review were stretched to the point urged by the Administrator, their limited support for his broad interpretation of Section 16(a) would easily be outweighed by stronger policy considerations for declining to indulge in so expansive an interpretation. In order to effectuate the purpose of centralized and timely review of specified administrative actions,[75] Congress not only conferred jurisdiction upon this court but it simultaneously withdrew jurisdiction from all other courts in all other related proceedings. Section 16(a) decrees that

[a]ction of [the] Administrator with respect to which review could have been obtained under this subsection shall not be subject to judicial review in civil or criminal proceedings for enforcement.[76]

So, once the period for seeking review in this court has expired, the facial validity of a provision reviewable under Section 16(a) is ostensibly beyond challenge.[77] This phenomenon raises the spectre of possible unfairness, particularly to small manufacturers who may lack resources to monitor the Administrator's actions to assure protection

**71.** Compare Noise Control Act of 1972, § 5(b)(1), 42 U.S.C. § 4904(b)(1) (1976) (identification of major noise sources to be accomplished within specified time limit) and *id.* § 6(a)(3), 42 U.S.C. § 4905(a)(3) (1976) (noise emission standards to be set within specified time limits) with *id.* § 13(a)(3), 42 U.S.C. § 4912(a)(3) (1976) (no time limit on promulgation of regulations respecting availability of products for testing).

**72.** See *Foti v. Immigration & Naturalization Serv.,* 375 U.S. 217, 231–232, 84 S.Ct. 306, 314–316, 11 L.Ed.2d 281, 291–292 (1963), where plain statutory language, its legislative history and the policy against bifurcation of review all combined to induce the Court's holding that denials of suspension of deportation constituted "final orders of deportation" within the meaning of the exclusive review provision of the Immigration and Nationality Act, Pub.L. No. 87–301, § 5(a), 75 Stat. 651 (1961), 8 U.S.C. § 1105a(a) (Supp. V 1962). See also *Lubrizol Corp. v. Train,* 547 F.2d 310 (6th Cir. 1976).

**73.** See text *supra* at note 27.

**74.** See note 56 *supra.*

**75.** See text *supra* at notes 67–71.

**76.** Noise Control Act of 1972, § 16(a), 42 U.S.C. § 4915(a) (1976).

**77.** See, however, *Adamo Wrecking Co. v. United States, supra* note 59, where the Supreme Court interpreted the identical provision in the Clean Air Amendments of 1970 to permit defendants accused in a criminal proceeding of non-compliance with emission standards—an infraction of § 113(c)(1)(C) of that legislation 42 U.S.C. § 1857c–8(c)(1)(C) (1976)—to raise the question "whether the regulation which the defendant is alleged to have violated is on its face an 'emission standard' within the broad limits of the congressional meaning of that term." 434 U.S. at 284–285, 98 S.Ct. at 572–573, 54 L.Ed.2d at 548–549.

of the opportunity to contest regulations affecting their interests.[78] Indeed, the Administrative Conference of the United States has recommended amendment of the environmental statutes to allow the invalidity of a regulation to be raised as a defense in an enforcement proceeding:

> The express preclusion of review at the enforcement stage creates a highly unusual and unnecessary harsh restriction on the right to challenge the validity of a regulation to which one is subject.[79]

And the Supreme Court has suggested that the constitutional validity of the preclusive review provision of the Clean Air Act Amendments merits serious consideration.[80] Although, in *Yakus v. United States*,[81] the Court sustained the constitutionality of a similar provision in the Emergency Price Control Act of 1942,[82] that holding may be

distinguishable on the ground that the *Yakus* provision was a "war emergency measure." [83] The nagging presence of a substantial due process question indicates, then, at the very least, the propriety of a narrow interpretation of Section 16(a).

We are mindful that an agency's interpretation of the statute it administers is entitled to great deference.[84] But, yielding that, it is ultimately for us to make the determination on our jurisdiction to hear a case.[85] On its face, Section 16(a) limits us to review of standards and regulations promulgated under particular sections of the Act [86]—in the present instance, Section 6 [87]—and we find that the Administrator's enforcement procedures cannot rest on Section 6.[88] While Section 16(a) might lend itself to an interpretation permitting review of some actions somewhat beyond Section 6 standards and regulations, the deci-

---

**78.** See *Adamo Wrecking Co. v. United States, supra* note 59, 434 U.S. at 290, 98 S.Ct. at 575, 54 L.Ed.2d at 552 (concurring opinion). The unfairness of barring later review in individual enforcement actions is particularly clear in these cases because it was only after petitions for review were filed and the 90-day period for review had expired that the Administrator claimed that the enforcement regulations were promulgated pursuant to § 6. See 41 Fed.Reg. 15540 (1976) (no section specified as source for inspection and monitoring provisions; § 11(d)(1), 42 U.S.C. § 4910(d)(1) (1976) specified as source for recall and cease-to-distribute provisions); 40 C.F.R. § 205.59(a) (1977) (recall provisions issued pursuant to § 11(d)(1), 42 U.S.C. § 4910(d)(1) (1976)); *id.* § 205.4(f)(1) (1977) (cease-to-distribute provision promulgated under § 11(d)(1), 42 U.S.C. § 4910(d)(1) (1976)); Letter from G. William Frick (on behalf of EPA) to Howard P. Willens (Jan. 26, 1977), Petitioners' Appendix 1–2.

**79.** 41 Fed.Reg. 56768 (1976).

**80.** See *Adamo Wrecking Co. v. United States, supra* note 59, 434 U.S. at 289, 98 S.Ct. at 575, 54 L.Ed.2d at 551 (concurring opinion) ("[i]f the constitutional validity of § 307(b) of the Clean Air Act had been raised by petitioner, I think it would have merited serious consideration"); see *Utah Power & Light Co. v. EPA, supra* note 57, 180 U.S.App.D.C. at 74 n.19, 553 F.2d at 219 n.19 ("[r]ecent judicial opinions have tended to construe [the preclusive review provision of the Clean Air Act] narrowly").

**81.** 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

**82.** § 204, 56 Stat. 23 (1942), 50 U.S.C.App. § 924 (Supp. II 1942), as amended by the Inflation Control Act of 1942, 56 Stat. 765 (1942), 50 U.S.C.App. § 961 *et seq.* (Supp. II (1942).

**83.** 434 U.S. at 290, 98 S.Ct. at 575, 54 L.Ed.2d at 551 (concurring opinion).

**84.** *E. g., Columbia Broadcasting Sys. v. Democratic Nat'l Comm.,* 412 U.S. 94, 121, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772, 794 (1972), quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1968).

**85.** See *Mansfield, C. & L. M. R. R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462, 463–464 (1884) (court must examine and determine jurisdiction for itself even in absence of complaint by parties); *Esola v. Groomes,* 520 F.2d 830, 834 n.16 (3d Cir. 1975) (a federal court is always required to examine its own jurisdiction); *Baxley v. Woody,* 473 F.2d 10, 12 (5th Cir. 1973) (accord); *Roberson v. Harris,* 393 F.2d 123, 124 (8th Cir. 1968) (lack of jurisdiction cannot be waived by parties or ignored by court); *Pacific Nat'l Ins. Co. v. Transport Ins. Co.,* 341 F.2d 514, 516–517 (8th Cir.), *cert. denied,* 381 U.S. 912, 85 S.Ct. 1536, 14 L.Ed.2d 434 (1965) (accord); *Rock Island Millwork Co. v. Hedges-Gough Lumber Co.,* 337 F.2d 24, 26–27 (8th Cir. 1964) (accord).

**86.** See text *supra* at note 27.

**87.** See text *supra* at notes 27–30.

**88.** See text *supra* at notes 35–81.

sions construing identical provisions of the Clean Air Act and the Federal Water Pollution Control Act caution that, with minor apparent but not real exceptions, the scope of review is strictly limited by the precise language of Section 16(a).[89] And though competing policy considerations bear on the jurisdictional question, on balance they too weigh in favor of a narrow interpretation of the Act's preclusive review provision.[90] We conclude, then, that we are without jurisdiction to review the Administrator's enforcement procedures.

## III. THE WARRANTY REGULATION

■ Section 6(d)(1) of the Noise Control Act of 1972 specifies that as soon as a regulation establishing a noise emission standard becomes effective,

> the manufacturer of each new product to which such regulation applies shall warrant to the ultimate purchaser[91] and each subsequent purchaser that such product is designed, built, and equipped so as to conform at the time of sale with such regulation.[92]

However straightforward this provision may be for other contexts, the organization of the truck-manufacturing industry generates a potential problem for its operation therein. Not uncommonly, one manufacturer constructs the basic vehicle—the chassis, engine and operator's compartment, known as a chassis-cab—and a subsequent manufacturer independently conducts whatever additional production processes—

for example, the mounting of a special-purpose body and equipment—are needed to adapt and ready the vehicle for its intended use. Thus, superficially at least, a question arises as to who, for purposes of the Act's warranty section, "the manufacturer" of that particular truck is.

When the Administrator originally proposed a body of noise control and related regulations, he included a provision placing liability upon both the manufacturer of the unfinished truck and the manufacturer who later rendered it functional.[93] After notice and comment, however, the Administrator confined the warranty to the initial manufacturer. In relevant part, the final regulation called upon "[t]he vehicle manufacturer who is required to production verify"[94] to warrant to the ultimate purchaser that the "vehicle was designed, built and equipped to conform at the time of sale to [him] with all applicable U.S. EPA noise control regulations."[95] Petitioners General Motors Corporation and International Harvester Company attack this provision on the ground that it contravenes the language of the Act and the intent of Congress. They further assert that the regulation unlawfully holds manufacturers of incomplete trucks vicariously responsible for nonconformance by subsequent manufacturers who complete them.

We do not encounter a jurisdictional barrier to consideration of these claims. The Act does not direct the Administrator to fashion a warranty regulation, but that does not mean that he cannot issue a regu-

---

**89.** See text *supra* at notes 61–66.

**90.** See text *supra* at notes 72–81.

**91.** The "ultimate purchaser" is "the first person who in good faith purchases a product for purposes other than resale." Noise Control Act of 1972, § 3(4), 42 U.S.C. § 4902(4) (1976).

**92.** Noise Control Act of 1972, § 6(d)(1), 42 U.S.C. § 4905(d)(1) (1976).

**93.** 39 Fed.Reg. 38360 (1974). In the preamble to the proposed regulations, the Administrator explained:
> [I]n developing this regulation, the Agency carefully assessed the meaning of the word "manufacturer" as used in the Act and concluded, based on the phrasing "any person

engaged in the manufacturing or assembling of new products," that these proposed regulations are applicable to persons engaged in application of enclosed bodies, racks, flat beds, mixer bodies, boost boxes, etc., to vehicles prior to receipt of the vehicle by the ultimate purchaser, as well as those persons traditionally considered vehicle manufacturers.

*Id.* at 38341.

**94.** The manufacturer of the chassis-cab is required to production verify. See 40 C.F.R. §§ 205.55–1(b), 205.51(a)(29) (1977); note 22 *supra*.

**95.** 40 C.F.R. § 205.58–1(a) (1977).

lation interpreting Section 6(d)(1), the statutory warranty provision.[96] In the regulations—both proposed and final—on that subject, the Administrator has endeavored to clarify the meaning of that section in its application to the truck-manufacturing industry. For better or for worse, he has articulated his understanding of the Section 6(d)(1) term "manufacturer" in its relation to that industry.[97] We are authorized to review "action of the Administrator . . . in promulgating [a] regulation under section 6 . . . of [the] Act,"[98] and the warranty regulation is plainly of that nature.

### A. Consistency With the Act

Reverting, then, to the merits, we first address the contention that the regulation is in conflict with the Act. The Administrator would relieve from any warranty obligation manufacturers who wind up the production of a theretofore unfinished truck, and would place full warranty liability upon the manufacturer of the basic vehicle, not only for his own departures from the noise emission standards but also for those of subsequent manufacturers.[99] The Administrator thus has sharply restricted the tenor of the word "manufacturer" as used in Section 6(d)(1), and in doing so has come fatally into collision with it.

The Act levies the warranty upon "the manufacturer of each new product to which [a noise emission] regulation applies."[100] The statutory definition of "manufacturer" includes "*any* person engaged in the manu-

facturing or *assembling* of new products."[101] Even if the Act said no more, we would think it reasonably clear that the manufacturer who completes the basic truck for commercial use is intercepted by the warranty section.[102] The fact is, however, that the Act does say significantly more. It ties the warranty to "each new product"[103] and, with exceptions inapposite here, declares that "[t]he term 'product' means any manufactured article or goods or component thereof."[104] So, not only are those who "manufactur[e] . . . new products" "to which [a noise emission] regulation applies" subjected to the Act's warranty requirement but also those who produce similarly covered "new product[s]" through "assembl[y]" of newly "manufactured article[s] . . . or component[s] thereof." It follows that the Act fastens the warranty obligation upon the manufacturer who assembles the basic truck and other components into the finished product—the "new product to which [the] regulation applies."[105]

Our construction of Section 6(d)(1) does not suffer from any lack of a decisional parallel. In *Rex Chainbelt, Inc. v. Volpe*,[106] regulations purportedly issued under the National Traffic and Motor Vehicle Safety Act of 1966[107] commanded final-stage manufacturers of motor vehicles to make the sole certification of compliance of the entire vehicle, including portions produced and installed by the incomplete-vehicle manufacturer, with federal safety standards. One section of that legislation instructed "every

---

**96.** See, *e. g., General Elec. Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 410–411, 50 L.Ed.2d 343, 357 (1976); *Joseph v. United States Civil Serv. Comm'n,* 180 U.S.App.D.C. 281, 294–295 & nn.24–27, 554 F.2d 1140, 1153–1154 & nn.24–27 (1977); Davis, *Administrative Law of the Seventies,* § 5.03–1 at 152 (1976).

**97.** See text *supra* at note 92.

**98.** See text *supra* at note 28 and Part II *supra.*

**99.** See text *supra* at note 95.

**100.** See text *supra* at note 92.

**101.** Noise Control Act of 1972, § 3(6), 42 U.S.C. § 4902(6) (1976) (emphasis supplied).

**102.** See *Rex Chainbelt, Inc. v. Volpe,* 486 F.2d 757, 762 (7th Cir. 1973), discussed text *infra* at notes 106–112.

**103.** See text *supra* at note 92.

**104.** Noise Control Act of 1972, § 3(3), 42 U.S.C. § 4902(3) (1976).

**105.** See text *supra* at note 92.

**106.** *Supra* note 102.

**107.** Pub.L. No. 89–563, 80 Stat. 718 (1966), 15 U.S.C. §§ 1381 *et seq.* (1976) [hereinafter cited as codified].

manufacturer" to furnish the certification of compliance,[108] and another defined "manufacturer" as including "any person engaged in the manufacturing or assembling of motor vehicles or motor vehicle equipment." [109]  To the court, the latter provision "plainly indicate[d] that an 'incomplete vehicle manufacturer' is a 'manufacturer' within the meaning of" the statute.[110]  The Administrator argues that *Rex Chainbelt* is distinguishable because the certification requirement there was laid on "every manufacturer."  We are unable to detect the difference suggested since Section 6(d)(1) here imposes the warranty on "the manufacturer," who is "*any* person engaged in the manufacturing or assembling of new products." [111]  In sum, "any" "manufacturer" can mean no less than "every" manufacturer.[112]

We do not lose sight of the deference courts traditionally yield to an agency's interpretation of its governing statute,[113] particularly when it " 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are [as] yet untried and new.' " [114] This principle, however, is much less an encumbrance to independent adjudication when, as here, the administrative ruling is interpretive rather than legislative in character.[115]  Moreover, courts simply cannot approve a reading of the statute that is contrary to its plain language.[116]  The Administrator's regulation undertakes to exempt one type of truck manufacturer from compliance with the statutory warranty provision, and in so doing it contravenes the Act's mandate on that score.

**108.**  15 U.S.C. § 1403 (1976).

**109.**  *Id.* § 1391(5) (1976).

**110.**  486 F.2d at 762.

**111.**  See text *supra* at note 101 (emphasis supplied).

**112.**  As the Administrator concedes, "[i]f [the Act] did say *every*, the court might well be compelled as was the [court] in *Rex Chainbelt* [ ] to find that the statute does not allow relieving any manufacturer from the warranty responsibility."  Brief for Respondent at 48–49.

**113.**  *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616, 625–627 (1965); *Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179, 187 (1965); *Thompson v. Clifford*, 132 U.S.App.D.C. 351, 363, 408 F.2d 154, 166 (1968).

**114.**  *Power Reactor Dev. Co. v. International Union of Electrical, Radio & Machine Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961), quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933); see *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935–936, 19 L.Ed.2d 1090, 1098 (1968); *Udall v. Tallman, supra* note 113, 380 U.S. at 16, 85 S.Ct. at 801, 13 L.Ed.2d at 625; *NLRB v. Hearst Publications*, 322 U.S. 111, 130–131, 64 S.Ct. 851, 860–861, 88 L.Ed. 1170, 1184–1185 (1944); *Natural Resources Defense Council v. Train*, 166 U.S.App.D.C. 312, 326, 510 F.2d 692, 706 (1974).

**115.**  See *Joseph v. United States Civil Serv. Comm'n, supra* note 96, 180 U.S.App.D.C. at 295 n.26, 554 F.2d at 1154 n.26; Davis, *Administrative Law of the Seventies,* § 5.05 (1976). Compare *General Elec. Co. v. Gilbert, supra* note 96, and *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) with *United States v. Howard,* 352 U.S. 212, 77 S.Ct. 303, 1 L.Ed.2d 261 (1957) and *American Tel. & Tel. Co. v. United States,* 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936).

**116.**  See *Dixon v. United States,* 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223, 228 (1965) ("[a] regulation which . . . operates to create a rule out of harmony with the statute is a mere nullity"); *Manhattan Gen. Equip. Co. v. Commissioner of Internal Revenue,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528, 531 (1936) (accord); *Rex Chainbelt, Inc. v. Volpe, supra* note 102, 486 F.2d at 761–762.  This is particularly so, where, as here, the agency has previously expressed a contrary interpretation of the relevant statutory language.  See note 93 *supra*.  In *General Elec. Co. v. Gilbert, supra* note 96, the Supreme Court, in invalidating an interpretation of Title VII by the Equal Employment Opportunity Commission, stated:

> [T]he . . . guideline flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute. . . . We have declined to follow administrative guidelines in the past where they conflicted with earlier pronouncements of the agency.

429 U.S. at 142–143, 97 S.Ct. at 411, 50 L.Ed.2d at 358.

## B. *Imposition or Vicarious Liability*

Even if Section 6(d)(1) were susceptible to the Administrator's interpretation, we would nonetheless be constrained to invalidate this regulation. The additional difficulty is encounters is that it seeks to cast liability on the incomplete-vehicle manufacturer for noise-emission violations—additional to those of his own making—attributable wholly to the subsequent independent manufacturer who finishes the vehicle. The Administrator's regulation explicitly requires that the Section 6(d)(1) warranty include the *following* statement:

> This warranty is not limited to any particular part, component or system of the vehicle. Defects in the design, assembly, or in any part, component or system of the vehicle which, at the time sale to [the ultimate purchaser] cause noise emission levels to exceed Federal standards are covered by this warranty for the life of the vehicle.[117]

Since the regulation would confine the warranty obligation to the chassis-cab manufacturer,[118] the Administrator clearly contemplates that that manufacturer will bear the responsibility for any action of the subsequent manufacturer taking the vehicle out of compliance with the noise emission standards.

This allocation of warranty liability forebodes dire consequences for first-stage manufacturers. Section 6(d)(2) of the Act provides that "any cost obligation of any dealer incurred as a result of [the warranty requirement of Section 6(d)(1)] shall be borne by the manufacturer,"[119] and in the Administrator's view that manufacturer is the one who completes the chassis-cab for marketing. We are aware that some protection from liability flows from Sections 10(a)(2)[120] and 11(a),[121] which ban alteration of noise-related systems in a complying though unfinished vehicle and impose substantial penalties for failure to observe that prohibition. The Administrator also asserts that "[t]he manufacturer of the basic truck can protect himself from the subsequent manufacturer's breaking that law through indemnification agreements and other contractual arrangements."[122] To be sure, these provisions may reduce the incidence of liability, but most certainly they cannot entirely eliminate it.

The Administrator does not refer us to anything in the Act that might undergird a regulation imposing liability on first-stage manufacturers for noise-emission violations that are wholly the fault of second-stage manufacturers, and we search in vain for statutory authorization of that sort. Indeed, the legislative history of the Act is precisely to the contrary: the Senate Committee expressly stated that it intended that the manufacturer be liable only for those changes in noise emissions which are in fact within his control.[123] Nor is there a common law basis upon which liability could be predicated vicariously, for in the situation complained of the chassis-cab manufacturer has no dominion whatsoever over the subsequent manufacturer. In decisionally indistinguishable circumstances we have twice held that the Administrator lacks power to impose liability upon a blameless party for the acts of another beyond his control.[124] These rulings are fully binding upon us, and they dictate the same result here. We are fully cognizant of the difficulties of allocating the warranty burden between separate manufacturers, but we are confident that the Administrator can

---

117. 40 C.F.R. § 205.58–1(a) (1977).

118. See Part III(a) *supra.*

119. 42 U.S.C. § 4905(d)(2) (1976).

120. *Id.* § 4909(a)(2) (1976).

121. *Id.* § 4910(a) (1976).

122. Brief for Respondents at 52.

123. S.Rep. No. 92–1160, 92d Cong., 2d Sess. 6–7 (1972).

124. *Amoco Oil Co. v. EPA,* 177 U.S.App.D.C. 123, 543 F.2d 270 (1976); *Amoco Oil Co. v. EPA,* 163 U.S.App.D.C. 162, 188–189, 501 F.2d 722, 748 (1974). See also *Rex Chainbelt, Inc. v. Volpe, supra* note 102, 486 F.2d at 762.

deal adequately with the problems through new regulations.[125]

We find that we have no jurisdiction to pass on the validity of the Administrator's enforcement regulations. We conclude that the challenged warranty provision is unauthorized. We remand this litigation to the Administrator for further proceedings not inconsistent with this opinion.

*So ordered.*

125. Compare *Rex Chainbelt, Inc. v. Volpe, supra* note 102, 486 F.2d at 762.