642 F.2D 458

**ATLAS COPCO, INC., et al., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 76–1354.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1978.

Decided April 9, 1979.

Supplemental Opinion on Denial of Rehearing May 30, 1980.

Richard H. Grimer, Washington, D. C., for petitioners.

Jeffrey O. Cerar, Atty., Environmental Protection Agency, Washington, D. C., with whom G. William Frick, General Counsel, Environmental Protection Agency, James W. Moorman, Acting Asst. Atty. Gen., and Patrick A. Mulloy, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondent.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Petitioners, eleven manufacturing concerns [1] producing the great majority of the portable air compressors sold annually in the United States,[2] are before us for review of regulations promulgated by the Administrator of the Environmental Protection Agency (EPA) purportedly pursuant to the Noise Control Act of 1972.[3] The regulations at issue prescribe noise emission standards and establish testing and enforcement procedures for new portable compressors introduced into interstate commerce.[4] The manufacturers attack numerous facets of the Administrator's regulatory program on various grounds, both statutory and constitutional in character.

The Act requires the Administrator to control the spread of noise pollution through regulations fixing federal maximum noise emission levels for designated products.[5] In execution of this congressional mandate, the Administrator published a list of "major sources of noise," [6] including thereon portable air compressors,[7] and set emission standards for these products.[8] In addition to permissible sound levels, the regulations establish an elaborate testing

---

1. Petitioners are Atlas Copco, Inc.; Chicago Pneumatic Tool Company; Dresser Industries, Inc., Le Roi Division; Gardner-Denver Company; Ingersoll-Rand Company; The Jaegar Machine Company; Joy Manufacturing Company; Quincy Compressor Division, Colt Industries Operating Corporation; Schramm, Inc.; Gordon Smith & Company, Inc. and Worthington Compressors, Inc.

2. Brief for Petitioners at 3.

3. Pub.L.No.92–574, 86 Stat. 1234 (1972), 42 U.S.C. §§ 4901 *et seq.* (1976).

4. 40 C.F.R. pt. 204 (1977). Citation of regulations hereinafter is to that source.

5. Noise Control Act of 1972, §§ 2(b), 6(a)–(c), 42 U.S.C. §§ 4901(b), 4905(a) ·(c) (1976).

6. 39 Fed.Reg. 22297 (1974).

7. *Id.* at 22298-22299.

8. 41 Fed.Reg. 2162 (1976), codified in 40 C.F.R. pt. 204 (1977).

program,[9] which imposes the major share of responsibility for compliance testing on the manufacturer,[10] and monitoring,[11] inspection [12] and enforcement [13] procedures, which enable EPA officials to ensure conformity with required emission levels. While petitioners do not contest the sound levels decreed by the regulations, they do challenge the remaining features of the regulatory scheme noted above.

■■■ We observe initially, however, that we lack jurisdiction to consider many of the issues petitioners pose. To the extent relevant, Section 16(a) of the Noise Control Act provides that a "petition for review of action of the Administrator . . . in promulgating any standard or regulation under section 6 . . . of this Act . . . may be filed" in this Court.[14] Our power to adjudicate claims under the Act is, of course, correspondingly limited by the terms of this grant.[15] As we today hold in *Chrysler Corporation v. EPA*,[16] a companion case, monitoring, inspection and enforce-

ment regulations elude Section 16's narrow reach because they do not owe their existence to Section 6,[17] and thus are beyond the scope of our authority. Other complaints registered by petitioners, however, focus on testing regulations stemming from Section 6(c)(1),[18] and therefore do meet the jurisdictional prerequisites of Section 16. These are the subjects of our present review.[19]

## I. THE REGULATORY SCHEME

Section 6(c)(1) of the Noise Control Act authorizes the Administrator to set decibel (dBA) limits on noise emissions.[20] It also sanctions "testing procedures necessary to assure compliance with the emission standard . . . ." [21] The regulations at issue effectuate this delegated power by erecting a series of related procedures.

The primary testing phase is production verification.[22] Prior to distribution in commerce, one test compressor [23] from each

**9.** 40 C.F.R. §§ 204.55–10, 204.57–1 and -8 (1977).

**10.** The testing regulations by design leave actual testing of products in the hands of individual manufacturers to the greatest extent possible. This approach, with its built-in conflict of interest, while considered less burdensome to the parties involved, calls out loudly for a total regulatory scheme capable of providing a check on manufacturer participation. The Administrator's selective enforcement auditing program, described in Part I *infra*, coupled with the agency's inspection and monitoring programs, attempt to satisfy this need.

**11.** 40 C.F.R. §§ 204.4, 204.53, 204.56 (1977).

**12.** *Id.* § 204.4 (1977).

**13.** *Id.* §§ 204.4(f), 204.5–6, 204.55–1, 204.55-11, 204.56(b)(2), 204.57–1(f), 204.59 (1977).

**14.** Noise Control Act of 1972, § 16(a), 42 U.S.C. § 4915(a) (1976). Section 16(a) also authorizes review of standards and regulations promulgated under §§ 17 and 18, which apply respectively to railroads and motor carriers and consequently have no role in this case.

**15.** See *Hagans v. Lavine*, 415 U.S. 528, 538, 94 S.Ct. 1372, 1379–1380, 39 L.Ed.2d 577, 588 (1974); *Koch v. Zuieback*, 316 F.2d 1, 3 (9th Cir. 1963).

**16.** 195 U.S.App.D.C. 90, 600 F.2d 904 (1979).

**17.** The monitoring and inspection regulations, cited *supra* notes 11, 12, were promulgated pursuant to § 13 of the Act, 42 U.S.C. § 4912 (1976). Some enforcement regulations, 40 C.F.R. §§ 204.5–6, 204.55–1 (1977), stem from § 10, 42 U.S.C. § 4909 (1976), and others, 40 C.F.R. §§ 204.4(f), 204.55-11, 204.56(b)(2), 204.57–1(f), 204.59 (1977), from § 11, 42 U.S.C. § 4910 (1976).

**18.** 42 U.S.C. § 4905(c)(1) (1976).

**19.** Although §§ 6 and 13 of the Act, 42 U.S.C. §§ 4905, 4912 (1976), arguably overlap in authorizing the Administrator to establish testing procedures, we deem it sufficient for our jurisdiction that 40 C.F.R. §§ 204.55·10 and 204.57–1, -8 (1977) are within the scope of § 6.

**20.** 42 U.S.C. § 4905(c)(1) (1976).

**21.** *Id.*

**22.** 40 C.F.R. § 204.55 (1977).

**23.** A test compressor must have been assembled by use of the manufacturer's normal production process, and must be one that will be sold or offered for sale in commerce. 40 C.F.R. § 204.55–5 (1977). Without prior EPA approval, a test compressor is not to be prepared, tested, modified, adjusted or maintained in any manner save as part of the manufacturer's prescribed procedures. *Id.* § 204.55–6 (1977).

configuration[24] of compressors must undergo production verification under the control of the manufacturer.[25] A specified configuration is considered verified once it has been shown, through relevant noise measurement testing methodology, that the test compressor for that configuration meets the applicable noise level standard.[26] To minimize the burden of this self-testing procedure, a manufacturer may test, in lieu of all configurations, the highest noise-emitting configuration in a particular category,[27] and compliance of that test product with the emission standards is sufficient verification of all products within the category.[28] The regulations additionally require annual verification for each configuration, or category when appropriate, whether modifications in the basic parameters of a configuration have occurred or not.[29] The Administrator may, on request of a manufacturer, waive the annual testing requirement.[30]

Production verification is supplemented by EPA's selective enforcement auditing (SEA) program.[31] Because of the limited amount of actual testing involved in production verification, a test product's compliance with established noise levels does not assure the conformity of each subsequently produced compressor within that configuration. It was to meet this problem that the SEA program was devised. The Administrator initiates this testing procedure by a request specifying a category, configuration or group of configurations to be examined, as well as the manufacturer's plant or storage facility from which the compressors must be selected.[32] Following receipt of the request, the manufacturer must conduct further product testing;[33] the same procedures employed in production verification are utilized, but on a broader base of compressors.[34] The data thus gathered are used as a statistical sampling of randomly selected and tested products sufficient in number to enable a valid inference as to whether the sampled population meets applicable emission standards, and that forms the foundation for the audit. The cumulative test results are compared with acceptance-rejection rates established for the particular

24. A "compressor configuration" is the basic classification unit of a manufacturer's product line. It is comprised of compressor lines, models, or series which are identical in all material respects with regard to specified parameters. *Id.* §§ 204.51(d), 204.55–3 (1977).

25. *Id.* § 204.55–2 (1977).

26. *Id.* § 204.55–2(c)(2) (1977).

27. *Id.* § 204.55–2(c)(1)(ii) (1977). A "category" consists of a group of compressor configurations that are identical in all aspects with regard to specified parameters. *Id.* §§ 204.51(e), 204.55–2 (1977).

28. *Id.* § 204.55–2(c)(2) (1977).

29. *Id.* § 204.55–10(a) (1977). Section 204.55–3 (1977) provides:
(a) A separate compressor configuration shall be determined by each combination of the following parameters:
(1) The compressor type (screw, sliding vane, etc.)
(2) Number of compressor stages
(3) Maximum pressure (psi)
(4) Air intake system of compressor:
(i) Number of filters
(ii) Type of filters
(5) The engine system:
(i) Number of cylinders and configuration (L–6, V–8, V–12)
(ii) Displacement
(iii) Horsepower
(iv) Full load rpm
(6) Type cooling system, e. g., air cooled, water cooled
(7) Fan:
(i) Diameter
(ii) Maximum fan rpm
(8) The compressor enclosure:
(i) Height, length, and width
(ii) Acoustic material manufacturer, type, part number
(9) The induction system (engine):
(i) Natural
(ii) Turbocharged
(10) The muffler:
(i) Manufacturer
(ii) Manufacturer part number
(iii) Quantity of mufflers used

30. *Id.* § 204.55–10(a) (1977).

31. *Id.* § 204.57 (1977).

32. *Id.* § 204.57–1(a)–(c) (1977). The regulations do not specify the conditions under which an SEA request can or will be made.

33. *Id.* § 204.57–1(d) (1977).

34. See *id.* § 204.57 (1977).

sampling plan involved, and a decision on further testing is made.[35] The SEA procedure is not an attempt to impose quality control or quality assurance measures upon the manufacturer; rather, its aim is merely to audit the conformity of the manufacturer's product.[36]

In the event of an SEA failure, the regulations authorize imposition of a third testing procedure. Upon rejection of any batch sequence,[37] the "Administrator may require that any or all compressors of that category, configuration or subgroup thereof produced at that plant be tested before distribution in commerce."[38] The integration of these three testing phases results in a single testing scheme directed at providing the Administrator with an effective mechanism for ensuring product integrity.

## II. PRODUCTION VERIFICATION

■ Petitioners' first challenge is addressed to the production verification regulation,[39] with specific focus on the annual testing requirement. They argue that promulgation of the regulation in its present form denied interested parties the opportunity to comment meaningfully upon the course of action proposed, and thus violated the notice provisions of the Administrative Procedure Act.[40] They also contend that in light of the expressed purpose of production verification—"to verify whether a manufacturer has the requisite noise control

technology in hand and is capable of applying the technology in a manufacturing process"[41]—annual reverification in the absence of a model change is unreasonable.

Petitioners' claim of insufficient notice of the annual reverification requirement must be rejected. Their argument is premised on an allegation that the proposed verification regulation required reverification of a configuration only when one of the basic parameters of identification underwent modification.[42] Since this arrangement was acceptable to petitioners, they did not provide comment.[43] By the time petitioners allegedly became aware of the Administrator's current position mandating annual testing in all instances unless exempted, the comment period had ended and interested parties were effectively foreclosed from influencing the decisionmaking process.

This scenario is, however, unsubstantiated. The proposed regulation[44] is virtually identical to that finally promulgated. One section of the proposed standards expressly stated that "[p]roduction verification of each configuration will be required at the beginning of each model year. . . ."[45] Similarly, the preamble noted that the "manufacturer must production verify from one model year to the next."[46] Surely this information provided petitioners with sufficient insight into the program proposals to permit meaningful comment on annual reverification. Consequently, we find no basis

**35.** The Administrator has established permissible failure levels to be employed in judging SEA test results. See *id.* pt. 204, Appendix I (1977). Thus, an SEA is "passed" if the number of failing compressors is equal to or less than the maximum designated as acceptable, while it is "failed" if the number of rejected compressors exceeds the permissible failure rate.

**36.** 41 Fed.Reg. 2170 (1976).

**37.** A "batch" is a collection of compressors of the same category or configuration, as designated in a test request by the Administrator. 40 C.F.R. § 204.51(j) (1977). Rejection of a batch sequence means that the number of rejected batches in the sequence is less than the sequence acceptance number as determined by the appropriate sampling plan. *Id.* § 204.51(s) (1977). See note 35 *supra.*

**38.** *Id.* § 204.57–8(a) (1977), as amended by 42 Fed.Reg. 61455 (1977).

**39.** 40 C.F.R. § 204.55–10 (1977).

**40.** 5 U.S.C. § 553(c) (1976).

**41.** 41 Fed.Reg. 2170 (1976).

**42.** See note 29 *supra.*

**43.** Brief for Petitioners at 40.

**44.** 39 Fed.Reg. 38186 (1974).

**45.** *Id.* at 38200.

**46.** *Id.* at 38189.

for concluding that the Administrator disobeyed the requirements of the Administrative Procedure Act. Moreover, given this opportunity to object at the agency level, petitioners cannot now be heard to complain in this court for the first time.[47]

▮ Nor can we in any event agree with petitioners' characterization of the annual reverification requirement as unjustifiable. The reasonableness of the annual test is apparent when the testing program is viewed in its entirety. Production verification, without more, involves actual testing of but one compressor per configuration.[48] And, in many instances, actual testing is further limited by the manufacturer's option to subject only the highest sound-emitting configuration in a specified category to examination for compliance.[49] As a result, only a small number of compressors relative to the total produced undergo testing. This process is but the first stage in a plan of progressive testing that attempts to balance the need for testing with an effort to minimize the concomitant burden imposed upon manufacturers under a program that places upon them responsibility for testing their own products.

It must be recognized, too, that while initial verification is the foundation of the testing scheme, it does no more than demonstrate that at the time of testing the manufacturer has the working capability to produce complying compressors. Petitioners' argument that periodic scrutiny of that capability is unwarranted fails to acknowledge variables inherent in the production process which, in the course of a year, might well affect this capability.[50] Absent a continuous testing program, the increasing possibility of undetected quality deterioration poses an unnecessary hazard to the environment. Although the SEA procedure possibly could uncover slippage, its purpose is not to ensure quality control, and need not be relied upon to that end.[51] By requiring annual reverification, the Administrator is able to check the performance of a manufacturer's production process with minimum added burden to the manufacturer.

This requirement is wholly consistent with the announced purpose of production verification. Confirmation of the control technology of a manufacturer and his ability to apply that technology in a manufacturing context is necessarily a continuing task necessitating, at the least, a periodic testing program; adequate but less burdensome verification to assure environmental protection is not otherwise practicable;[52] and the beginning of each model year, as defined by the regulations, is certainly a suitable time for this needed reexamination.[53] Moreover, it should be noted that the Administrator is empowered to waive the annual testing requirement upon request.[54] Pertinent to the exercise of this discretion are the standards in effect for the model years in question, performance based upon product verification data for previous years, performance based on selective enforcement testing, and the number and type of noise emission design changes

**47.** *Portland Cement Ass'n v. Ruckelshaus*, 158 U.S.App.D.C. 308, 327, 486 F.2d 375, 394 (1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

**48.** See text *supra* at notes 23–25.

**49.** See text *supra* at notes 27–28.

**50.** For example, the wear and tear on a manufacturer's machines over a year's time, or error inevitably resulting from human involvement in the production process, are variables that might upset the manufacturer's compliance capability even though the basic parameters of a configuration remain unchanged.

**51.** The infrequent use of SEA testing contemplated by EPA also makes it an inadequate substitute for annual reverification.

**52.** Certainly adequate alternative testing might substitute for the required configuration reverification. It is difficult, however, to conceive of any procedure less burdensome.

**53.** "Model year" is defined as the manufacturer's annual production period that includes January 1 of such calendar year. If the manufacturer has no annual production period, the term refers to the calendar year. 40 C.F.R. § 204.-51(c) (1977).

**54.** *Id.* § 204.55–10 (1977).

incorporated into the new models.[55] The provision for waiver of annual reverification, when the circumstances of individual manufacturers indicate no useful purpose will be served by it, serves to bolster the propriety of the overall testing scheme as viewed in its balancing context.

### III. SELECTIVE ENFORCEMENT AUDITS

Petitioners' second challenge is directed at the selective enforcement audit program.[56] The manufacturers maintain that the SEA regulation is standardless, and thus inherently arbitrary, because it does not indicate the conditions under which audit testing may or will be requested.[57] During the period provided for comment, the Administrator noted his agreement, in spirit, at least, with the manufactures' position that selective audits should be conducted only when there is ground for believing that noncomplying compressors are being introduced into commerce,[58] but the regulation as finalized contains no corresponding facial restriction.

Relying upon the broad scope of his statutory authority, the Administrator insists that neither cause nor any other threshold trigger is required before testing may be ordered.[59] Indeed, the only express statutory limitation on establishment of a testing procedure is that it be necessary to assure compliance with emission standards.[60] The Administrator also urges that in any event the questioned regulation does not itself impose a testing obligation. Rather, he says, it merely establishes the procedure to be followed by EPA in making a testing request, the method by which results will be reported, and the options available to the agency in the event an SEA is filed; testing, he adds, is at the discretion of the Administrator on a case-by-case basis. Accordingly, the Administrator argues that any challenge to an SEA request should be presented at the time it is made.

■ We are well aware of the judicial disdain traditionally accorded standardless regulations.[61] Ofttimes, out of necessity, delegations of regulatory power to agencies offer little in the way of concrete guidance toward accomplishment of stated goals. Such imprecise authorizations nonetheless garner judicial sanction on the assumption that the agency, pursuant to its mandate from the legislature, will fill the gaps through the rulemaking process.[62] When the agency fails to supply this necessary precision, the continuing vagueness may be too great to withstand judicial scrutiny.[63] Cases cited by petitioners amply demonstrate the point.[64] In each, the reviewing court was confronted with a regulation summoning covered parties to achieve specified objectives. No guidelines, however, were offered by which regulated parties could measure their performance against the announced end. A blanket requirement compelling compliance in the absence of an indication of the factors considered controlling is impermissibly vague. Even the grant of broad rulemaking authority from Congress cannot excuse such imprecision.

■ Despite petitioners' hue and cry, however, the litigation before us now does not present such a problem. The criteria for SEA compliance are readily ascertainable from the regulations;[65] resultantly, pe-

---

55. *Id.*

56. *Id.* § 204.57 (1977).

57. See note 32 *supra.*

58. 41 Fed.Reg. 2167 (1976).

59. As the Administrator notes, section 6 of the Act unqualifiedly authorizes "testing procedures necessary to assure compliance with the emission standard." Brief of Respondent at 22.

60. 42 U.S.C. § 4905(c)(1) (1976).

61. See cases cited *infra* notes 63–64.

62. See cases cited *infra* notes 63–64.

63. See, *e. g., South Terminal Corp. v. EPA,* 504 F.2d 646, 670 (1st Cir. 1974).

64. *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *South Terminal Corp. v. EPA, supra* note 63.

65. See 40 C.F.R. § 204.57 (1977).

titioners are in no position to claim that they lack adequate guidelines by which to measure their performances. Instead, what is unknown to regulated parties are the circumstances that will trigger an SEA test request. In examining this asserted deficiency, however, the nature of the audit must be carefully borne in mind.

Imposition of an SEA requires further compliance testing by the manufacturer so that a valid assessment of his products' conformity with applicable standards may be made and the information thus obtained may be reported to the agency. As a practical matter, this mechanism functions as an early stage of the oversight program. On the basis of data gathered from SEA test results, EPA is able to determine whether further testing is warranted. Consequently, what petitioners are in effect demanding is a statement defining the circumstances that will set the follow-up process in motion.

We perceive no justification for compelling the agency to furnish this information. Petitioners' legitimate interests lie in advance knowledge of the standards by which compliance will be judged, not of the specific conditions under which EPA will choose to utilize its limited resources to scrutinize the degree of compliance with the law. Admittedly, without express standards establishing precise guidelines, application of the SEA regulation is subject to abuse, but this is true of any testing capability. The solution lies not in a challenge to the facial validity of the program itself, for that is not where the potential for abuse exists.

Rather, objection is more appropriately aimed at a particular application of the program, where it can be reviewed against the backdrop of its own particular circumstances. Accordingly, we find the Administrator's SEA regulation sufficiently precise on its face to withstand the present attack, and pretermit further review to a separate action impugning its application for abuse, threatened or consummated.[66]

## IV. CONTINUED TESTING

In the event that a batch sequence [67] fails a selective enforcement audit, the Administrator envisions the possibility of an additional testing obligation. The regulations provide that upon such a rejection the Administrator "may require that any or all compressors of that category, configuration or subgroup thereof produced at that plant be tested before distribution in commerce." [68] After imposition of this further testing burden, a manufacturer may request a hearing, but only on the question whether the SEA was conducted properly and whether the criteria for batch sequence rejection were met.[69] Petitioners argue that this limitation on the scope of the hearing is arbitrary. They urge that evidence on the most important issue—the scope of any resulting testing order—is impermissibly excluded from consideration under this regulation.

We agree that the circumscription complained of unduly and unreasonably restricts the hearing provided for by the regu-

---

**66.** See *South Terminal Corp. v. EPA, supra* note 63, 504 F.2d at 670–671.

**67.** See note 37 *supra.*

**68.** 40 C.F.R. § 204.57–8 (1977), as amended by 42 Fed.Reg. 61455 (1977).

**69.** Originally, the contested regulation made no provision for a hearing. Following settlement negotiations, EPA agreed to propose an amendment to § 204.57–8 that would permit a hearing on the limited questions noted in text. Consequently, the Administrator, in his brief, initially raised a ripeness defense to petitioners' argument on this matter. Brief for Respondents at 25 ·26. The Administrator's position was that review of the entire continuum of testing proce-

dures is premature prior to promulgation of the stipulated hearing amendment. However, between submission of the briefs and oral argument, a final regulation in accord with the stipulation was issued. 42 Fed.Reg. 61455 (1977). Thus, while perhaps petitioners' argument on this matter was not ripe at the time this review was initiated, it is now. "[R]ipeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of [initiation] that must govern." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320, 351 (1974); see also *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

lation. We need not decide whether due process or the Act requires a hearing, for the Administrator has conferred one on his own accord. Nevertheless, having afforded a hearing procedure, the important inquiry is whether the Administrator may arbitrarily limit its scope, and we think the answer must be in the negative. Courts have generally recognized the discretion reposed in agencies when it comes to deciding whether to permit the introduction of particular evidence at a hearing.[70] That discretion, however, is not unbridled:

> One of the most important safeguards of the rights of litigants . . . in proceedings before an administrative agency vested with discretion, is that it cannot rightly exclude from consideration facts and circumstances relevant to its inquiry which upon due consideration may be persuasive weight in the exercise of its discretion.[71]

■ The Administrator contends that since failure of an SEA is the only precondition to subsequent testing under the regulation, it is sufficient that the hearing encompass that issue alone. This position is not, however, congruous with the scope of the regulation, which further contemplates a discretionary determination as to whether "any or all" compressors in the failing configuration must undergo more testing.[72] Clearly, then, evidence on whether a further testing order is appropriate, and if so as to which compressors, is relevant and "may be of persuasive weight in the exercise of [that] discretion."[73] So, in the absence of supporting justification, this blanket evidentiary exclusion is unreasonable, and cannot stand as it now reads.

## V. COMPLIANCE COSTS

■ The final reviewable challenge presented to us involves primarily an application of the mandate found in Section 6(c)(1)[74]—that regulations take into account the cost of compliance—to the selective enforcement audit program.[75] Petitioners say that the data upon which the Administrator based his estimate of SEA economic impact are inadequate to permit compliance with that provision. Specifically, the manufacturers claim that the "open-ended 'enforcement strategy'" found in the regulations makes informed consideration

70. *E. g., National Airlines, Inc. v. CAB,* 116 U.S.App.D.C. 114, 117, 321 F.2d 380, 383 (1963); *Clarksburg Publishing Co. v. FCC,* 96 U.S.App.D.C. 211, 215, 225 F.2d 511, 515 (1955).

71. *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 177, 61 S.Ct. 908, 923, 85 L.Ed. 1251, 1271 (1941) (dissenting opinion) (citations omitted).

72. See text *supra* at note 68.

73. *Pittsburgh Plate Glass Co. v. NLRB, supra* note 71, 313 U.S. at 177, 61 S.Ct. at 923, 85 L.Ed. at 1271 (dissenting opinion).

74. 42 U.S.C. § 4905(c)(1) (1976).

75. Petitioners raise questions concerning the application of the cost-of-compliance mandate to two other provisions subject to our review. They first claim that the inadequacy of EPA's data on cost of compliance is demonstrated by the exclusion of compressors of 600 cubic feet per minute (cfm) capacity or larger in the agency's computations on the cost of attaining a 76 dBA sound emission standard with a 3 dBA production tolerance. Brief for Petitioners at 51. It appears, however, that petitioners misread the study EPA employs on this point. A supplementary economic impact analysis prepared for EPA by General Electric-TEMPO does indicate an absence of available data on 600 cfm compressors, though there seems to be no problem with larger models; and, having found the data comparable, the study substituted its 750 cfm findings for the 600 category. Joint Appendix (J. App.) 200 204. Thus, there is no basis for the finding of inadequacy urged by petitioners.

Petitioners also urge that because EPA's Background Document, J. App. 98–196, in analyzing testing costs, noted that production verification costs could be expected to decrease by reason of a manufacturer's ability to utilize the initial verification report in subsequent years, it is not current with the final regulations requiring annual reverification. Again, petitioners' point is not well taken. This statement is completely consistent with the regulations as ultimately promulgated. Despite petitioners' protestations to the contrary, the fact remains that reverification waiver is distinctly possible where parameter modifications have not occurred and, accordingly, the Background Document's reference to decreased cost possibilities is not inaccurate.

of the cost of compliance impossible.[76] Because the Administrator may issue an SEA test request against an individual manufacturer as often as he deems necessary, it is not possible to predict the frequency with which a manufacturer will be burdened by test requests or to estimate the cost of the program on the industry.

When analyzed, however, petitioners' complaint is not persuasive. Certainly the absence of an express limit on the number of test requests puts a precise calculation of potential costs out of the question. Nonetheless, there is no basis in either the express statutory language or its legislative history to require such precision. The Act mandates no more than that in formulating regulations the Administrator take into account reasonable estimates as to the cost of compliance.[77] We think it evident that Congress did not intend the Administrator to be powerless to require further testing of a manufacturer's products—despite the need for such testing—simply because other test requests had already been issued against the manufacturer on prior occasions. Yet that is what acceptance of petitioners' position would mean.

Moreover, a requirement limited to reasonable estimates of cost, based upon anticipated innovation of the SEA program, is consistent with petitioners' own earlier-proffered interpretation of the statutory provision covering the SEA regulation. Petitioners urged this court to require the Administrator to preface SEA requests with a finding of "cause to believe non-complying compressors are being distributed in commerce."[78] As under the current standard, the suggested guideline is sufficiently "open-ended" to prohibit the precise cost-of-compliance analysis petitioners now urge. The internal inconsistency of petitioners' arguments strengthens our conclusion as to the fallacy inherent in this latter proposition. Consequently, the fact that the

present SEA regulation does not permit a precise prediction as to manufacturer cost of compliance does not foreclose the Administrator from honoring the mandate of the Act.

## VI.  CONCLUSION

Petitioners have presented several challenges to the regulations implementing the provisions of the Noise Control Act of 1972 in its application to portable air compressors. While the focus of many of the issues pressed is on provisions outside the jurisdictional grant found in Section 16(a) of the Act, and thus are immune from our review, the Administrator's product-testing program has received our scrutiny. Viewed in its entirety, it is clear that this integrated testing scheme is basically reasonable. The need for annual reverification of a compressor manufacturer's production capability cannot soundly be doubted. The selective enforcement auditing program is facially valid. Although a potential for abuse exists in its application, resolution of that problem is best left to consideration in the context of a specific decision to invoke the program. On these aspects of the litigation, we affirm.

The regulatory scheme, however, is deficient in that it unduly limits the scope of the hearing provided upon failure of an SEA. Reasonableness demands that evidence relevant to the scope of any order that may issue upon such a failure be considered by the agency. We hold this feature of the regulations invalid and, to enable corrective measures, we remand this litigation to EPA for further proceedings.

*So ordered.*

## ORDER

**PER CURIAM.**

Upon consideration of petitioners' petition for rehearing, of petitioners' supple-

---

76.  Brief for Petitioners at 50.

77.  Section 6(c)(1), 42 U.S.C. § 4905(c)(1) (1976), provides:

> Any regulation . . . respecting a product shall include a noise emission standard . . . taking into account . . . the

degree of noise reduction achievable through the application of the best available technology, and the cost of compliance.

78.  Brief for Petitioners at 34-38; see text *supra* at notes 56-66.

mentary memorandum in support thereof, and of respondent's memorandum regarding jurisdiction for rehearing, it is

ORDERED, by the Court, that petitioners' aforesaid petition for rehearing is denied for the reasons set forth in the Opinion filed for the Court herein this date.

Opinion PER CURIAM.

## SUPPLEMENTAL OPINION ON REHEARING

PER CURIAM:

Petitioners in this case have sought judicial examination of regulations promulgated by the Environmental Protection Agency (EPA) pursuant to the Noise Control Act of 1972.[1] Much as in a companion case, *Chrysler Corp. v. EPA*,[2] we earlier found that we lack jurisdiction to review the rules here challenged because they were not issued under authority of Section 6 of the Act.[3] Petitioners subsequently requested rehearing on four points, claiming that we did not reach them in our prior opinion. Despite our conviction that we had, and our belief that we were right in concluding that all four were beyond our statutory authority, we asked the parties to submit memoranda discussing jurisdiction. We have restudied the problem, and now reaffirm our previous determination that Congress has put the question petitioners pose beyond the purview of the courts.

In *Chrysler*, we held that Section 16(a) of the Act, which vests judicial review in the Court of Appeals for the District of Columbia Circuit, confers jurisdiction solely over administrative actions taken pursuant to Section 6 or either of two other provisions not here relevant.[4] Section 6 itself relates only to noise emission standards, testing procedures and manufacturers' warranties.[5] In our earlier opinion herein, we emphasized that "monitoring, inspection and enforcement regulations elude Section 16's narrow reach because they do not owe their existence to Section 6, and thus are beyond the scope of our authority."[6] The issues identified in the petition for rehearing are all of that character, and thus we are without power to entertain them.

### 1. "Vicarious Liability"

█ Petitioners first challenge Section 204.5–6(b) of EPA's regulations,[7] which they characterize as imposing vicarious liability upon manufacturers for misuse by distributors. This provision specifies that exemptions from noise standards will be deemed void *ab initio* if any term or condition of the exemption is breached, whether before or after distribution. As we noted in our prior opinion,[8] it was promulgated to implement Section 10 of the Act, which authorizes issuance of product exemptions "upon such terms and conditions as [the Administrator] may find necessary to protect the public health or welfare."[9] Under our holding in *Chrysler*, it is clear that the regulation falls outside of our jurisdiction.

Petitioners argue that, since in *Chrysler* we reached an issue of vicarious liability for noise emission violations, we must do so here as well. But the provision there at issue dealt with allocation of manufactur-

1. Pub.L.No.92–574, 86 Stat. 1234 (1972), 42 U.S.C. §§ 4901 *et seq.* (1976) [hereinafter cites as codified].

2. 195 U.S.App.D.C. 90, 600 F.2d 904 (1979).

3. *Atlas Copco, Inc. v. EPA*, 206 U.S.App.D.C. 53, 56, 642 F.2d 458, 461 (1979).

4. *Chrysler Corp. v. EPA, supra* note 2, 195 U.S.App.D.C. at 93, 600 F.2d at 907. The other two provisions relate to railroad and motor carrier noise emission standards. *Id.*

5. See 42 U.S.C. § 4905 (1976).

6. *Atlas Copco, Inc. v. EPA, supra* note 3, 206 U.S.App.D.C. at 56, 642 F.2d at 461 (footnote omitted).

7. 40 C.F.R. § 204.5–6(b) (1979).

8. *Atlas Copco, Inc. v. EPA, supra* note 3, 206 U.S.App.D.C. at 56 n.17, 642 F.2d at 461 n.17.

9. 42 U.S.C. § 4909 (1976).

ers' warranty liability, thus owing its existence to Section 6(d)(1) of the Act,[10] and consequently was specifically within our jurisdiction as defined by Section 16(a).[11] On the other hand, as we have stated, the vicarious liability sought to be imposed by Section 204.5–6(b) of the regulations seeks no justification in Section 6 of the Act, and accordingly is not subject to review here.

## 2. *Production Projections*

Petitioners also challenged the validity of Section 204.53(b) of the regulations,[12] which authorizes the Administrator to require manufacturers to submit information on production schedules. In the early stages of the litigation here, the court issued a stay, pending review, of one portion of a request for such data.[13] Petitioners now seek clarification on the possible continuing effect of the stay.

Ordinarily, of course, a stay issued pursuant to Federal Appellate Rule 8(a)[14] dissolves automatically upon resolution of the appeal.[15] Here, moreover, as we noted in our previous opinion,[16] we have no jurisdiction to review Section 204.53(b) because it was promulgated, not pursuant to Section 6, but under authority of Section 13,[17] dealing with records, reports and information. Manifestly, then, the stay will not survive our final disposition of the case.

## 3. *Submission Requirements*

Petitioners next seek review of Section 204.56(a)(1) of the regulations, which empowers the Administrator to "require that any compressor tested or scheduled to be tested pursuant to these regulations . . . be submitted to him, at such place and time as he may designate, for the purpose of conducting tests. . . ."[18] Since this rule interprets and implements the directive, in Section 13 of the Act, that manufacturers "make products coming off the assembly line . . . available for testing by the Administrator,"[19] and does not concern the testing procedures to which Section 6 speaks, it is beyond the jurisdiction granted this court by the Act.

## 4. *Percentage Requirements for Conformity*

Finally, petitioners challenge Section 204.55–1 of the regulations, which requires that *every* new compressor comply with the applicable performance standards.[20] This rule is an enforcement provision promulgated pursuant to Section 10 of the Act.[21] Consequently, our holding in *Chrysler* plainly leaves it outside the scope of judicial review.

In sum, we lack jurisdiction to resolve any of petitioners' current complaints. We so stated in our earlier opinion,[22] and today we lay the matter fully to rest. The petition for rehearing is accordingly

*Denied.*

**10.** 42 U.S.C. § 4905(d)(1) (1976); see *Chrysler Corp. v. EPA, supra* note 2, 195 U.S.App.D.C. at 103, 600 F.2d at 917.

**11.** 42 U.S.C. § 4915(a) (1976); see *Chrysler Corp. v. EPA, supra* note 2, 195 U.S.App.D.C. at 103, 600 F.2d at 917.

**12.** 40 C.F.R. § 204.53(b) (1979).

**13.** *Atlas Copco, Inc. v. EPA,* No. 76–1354 (D.C. Cir. Apr. 27, 1978) (order).

**14.** Fed.R.App.P. 8(a).

**15.** *FTC v. Food Town Stores, Inc.,* 547 F.2d 247, 249 (4th Cir. 1977).

**16.** *Atlas Copco, Inc. v. EPA, supra* note 3, 206 U.S.App.D.C. at 56 n.11, 56 n.17, 642 F.2d at 461 n.11, 461 n.17.

**17.** 42 U.S.C. § 4912 (1976).

**18.** 40 C.F.R. § 204.56(a)(1) (1979).

**19.** 42 U.S.C. § 4912(a)(3) (1976).

**20.** 40 C.F.R. § 204.55–1 (1979).

**21.** 42 U.S.C. § 4909 (1976); *Atlas Copco, Inc. v. EPA, supra* note 3, 206 U.S.App.D.C. at 56 n.17, 642 F.2d at 461 n.17; see Brief for Petitioners at 47; Brief for Respondents at 61; Reply Brief for Petitioners at 23.

**22.** *Atlas Copco, Inc. v. EPA, supra* note 3, 206 U.S.App.D.C. at 56 & n.17, 642 F.2d at 461 & n.17.