**RECREATION VEHICLE INDUSTRY ASSOCIATION, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**CHRYSLER CORPORATION, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**Nos. 76–1875, 78–1117.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 10, 1979.

Decided April 16, 1981.

---

**564**

Maurice H. McBride, Chantilly, Va., with whom David J. Humphreys, Henry G. Pons and Edmund C. Burnett, Chantilly, Va., were on the brief, for petitioner in No. 76–1875.

Patrick M. Raher, Washington, D. C., with whom Victor C. Tomlinson and Connie R. Gale, Detroit, Mich., were on the brief, for petitioner in No. 78–1117.

Barbara H. Brandon, Attorney, E. P. A., Washington, D. C., a member of the bar of the Supreme Court of Pennsylvania, pro hac vice by special leave of the Court, with whom James W. Moorman, Acting Asst. Atty. Gen., Angus MacBeth, Thomas A. Pursley, III, Attys., Dept. of Justice, Joan Z. Bernstein, Acting General Counsel, and Jeffrey O. Cerar, Atty., E. P. A., were on the brief, for respondent. Peter R. Taft and Charlotte Uram, Attys., Dept. of Justice, and Ronald S. Naveen and Gloria J. Ellis, Attys., E. P. A., Washington, D. C., also entered appearances for respondent.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Petitioners, manufacturers of motor homes,[1] challenge the decision of the Environmental Protection Agency (EPA) to treat their products as "medium and heavy trucks" for purposes of regulating noise emission levels[2] under the Noise Control Act of 1972.[3] EPA's promulgation of regulations to that end was procedurally defective, they contend, and without evidentiary foundation. Our review leads us to conclude that EPA not only acted within the bounds of the Act's procedural demands, but also provided adequate support for subjecting motor homes to the requirements established for medium and heavy trucks.

## I. BACKGROUND

In 1972, Congress enacted the Noise Control Act in response to the growing threat posed nationwide by uncontrolled noise in the environment.[4] In so doing, Congress declared that "it is the policy of the United

---

1. Petitioners are Recreation Vehicle Industry Association (RVIA) and Chrysler Corporation. RIVA is a national trade association of manufacturers and suppliers of recreational vehicles, and the representative in this litigation of the more than 130 motor home manufacturers among its members. Chrysler manufactures a wide variety of motor vehicles, including motor homes.

2. EPA Transportation Equipment Noise Emission Controls, 40 C.F.R. § 205 (1979).

3. Pub.L. No. 92–574, 86 Stat. 1234 (1972), codified at 42 U.S.C. §§ 4901–4918 (1976 and Supp. III 1979) [hereinafter sometimes cited only as codified].

4. See 42 U.S.C. § 4901(a)(1) (1976 and Supp. III 1979).

States to promote an environment for all Americans free from noise that jeopardizes their health or welfare."[5] The Act vests broad discretion[6] in the Administrator of EPA to coordinate the development of standards setting permissible noise levels,[7] and to issue regulations governing noise emissions of products introduced into the stream of commerce.[8]

To guide the Administrator in discharging the latter duty, the Act prescribes a two-step regulatory process. First, under Section 5(b), the Administrator must consult with appropriate federal agencies, and then compile and publish a list of products or classes of products that in his judgment are "major sources of noise."[9] Second, under Section 6(a), he must promulgate noise emission standards, to the extent deemed feasible, for each product which is identified, or which is part of a class identified, under Section 5(b),[10] and which falls within one of four designated product categories.[11]

In early 1974, EPA proceeded under Section 5(b) to assemble information on major sources of noise in the transportation equipment product category.[12] On June 21, 1974, EPA published a notice listing medium and heavy trucks,[13] one of nine subcategories of transportation equipment,[14] as a major source of noise.[15] Nowhere in the notice, however, was there any mention of motor homes.[16] Nevertheless, on October 30, 1974, EPA published proposed noise emission

5. *Id.* § 4901(b) (1976).

6. See note 55 *infra* and accompanying text.

7. 42 U.S.C. § 4903(c)(2) (1976).

8. *Id.* § 4905 (1976 and Supp. III 1979). The Administrator also has authority to regulate noise emissions of aircraft, 42 U.S.C. § 4906 (1976), interstate rail carriers, *id.* § 4916 (1976 and Supp. III 1979), and interstate motor carriers, *id.* § 4917 (1976 and Supp. III 1979), as well as to conduct research on the control of noise, *id.* § 4913 (Supp. III 1979).

9. 42 U.S.C. § 4904(b)(1) (1976). Section 5(b) also requires publication of information on techniques for the control of noise emanating from such products, "including available data on the technology, costs, and alternative methods of noise control." *Id.* § 4904(b)(2) (1976). See notes 32, 62 *infra.*

10. The Administrator may also propose regulations for any other product for which, in his judgment, noise emission standards are feasible and requisite to protect the public health and welfare. 42 U.S.C. § 4905(b) (1976). See note 62 *infra.*

11. 42 U.S.C. § 4905(a) (1976). The four product categories are
 (i) Construction equipment.
 (ii) Transportation equipment (including recreational vehicles and related equipment).
 (iii) Any motor or engine (including any equipment of which an engine or motor is an integral part).
 (iv) Electrical or electronic equipment.
42 U.S.C. § 4905(a)(1)(C) (1976). The manufacturer of a product for which a noise emission standard has been established not only must warrant to purchasers that the product conforms to the standard, 42 U.S.C. § 4905(d) (1976 and Supp. III 1979), but also is subject to fine and imprisonment for failure to comply with any applicable regulation, *id.* §§ 4904, 4910 (1976 and Supp. III 1979).

12. EPA began with an examination of sources that contribute to "community noise exposure," which the agency defined as "that exposure experienced by the community as a whole as a result of the operation of a product, as opposed to that exposure experienced by users of the product." 39 Fed.Reg. 22297, 22298 (1974), Appendix, Vol. II (App. II) 54. "Because of the extensive community exposure to noise emanating from products in the [transportation and construction equipment] categories," EPA initially focused exclusively on these categories. *Id.* Since our only concern is with transportation equipment, our discussion will refer to other categories only when necessary for purposes of clarity.

13. Medium and heavy trucks are those which have a gross vehicle weight rating (GVWR) in excess of 10,000 pounds. 39 Fed.Reg. 22297, 22298 (1974), App. II 54.

14. See 39 Fed.Reg. 22297, 22298 (1974), App. II 54. The agency divided transportation equipment into the following subcategories: (1) trucks (medium and heavy), (2) trucks (light, pickup), (3) automobiles (passenger), (4) automobiles (sport and compact models), (5) buses (city and school), (6) buses (intercity and highway), (7) motorcycles (highway), (8) motorcycles (off-road), and (9) snowmobiles.

15. 39 Fed.Reg. 22297, 22298 (1974), App. II 54.

16. *Id.*

standards [17] "applicable to any motor vehicle which has a gross vehicle weight rating (GVWR) in excess of 10,000 pounds, [and] which has been designed for transportation of persons and property on a highway or street . . . includ[ing] such vehicles as motor homes. . . ." [18]

Public hearings were held, and petitioners submitted written comments [19] challenging the inclusion of motor homes within the regulations' coverage. [20] Final regulations were published on April 13, 1976, [21] but, unlike the notice of proposed rulemaking, [22] they were not explicit about whether they were applicable to motor homes. Instead, the coverage section of the regulations broadly encompassed "any vehicle which has a gross vehicle weight rating (GVWR) in excess of 10,000 pounds, [and] which is capable of transportation of property on a highway or street." [23]

■ As a result, on May 13, 1976, petitioner Recreation Vehicle Industry Association sought clarification from EPA as to the applicability of the regulations to motor homes. [24] When, four months later, EPA still had not responded, RVIA filed a petition for review in this court. [25] Not until December 22, 1976, more than seven months after RVIA submitted its request for clarification, did EPA notify RVIA that the regulations were intended to embrace mo-

17. Although the Act required the Administrator to publish proposed regulations under § 6 within eighteen months of October 27, 1972, 42 U.S.C. § 4905(a)(2)(A) (1976), no challenge has been made on the basis of untimely issuance.

18. 39 Fed.Reg. 38338, 38341 (1974), App. II 59 (emphasis supplied). This section provided in relevant part:

This proposed regulation is applicable to any motor vehicle which has a gross vehicle weight rating (GVWR) in excess of 10,000 pounds, which has been designed for transportation of persons and property on a highway or street and which meets the definition of "new product" in the Act. . . .

Therefore, "medium and heavy duty trucks" as used in this proposed regulation, means any motor vehicle over 10,000 pounds GVWR, which includes such vehicles as motor homes. . . .

19. Interested parties may participate in EPA's § 6 rulemaking proceedings in accordance with the first sentence of 5 U.S.C. § 553(c) (1976), which provides for the submission of written data, views, and arguments with or without opportunity for oral presentation. 42 U.S.C. § 4905(c)(2) (1976).

20. Appendix (App.) 21–33; see EPA Background Document for Medium and Heavy Truck Noise Emission Regulations, A–2–1 to A–2–2 (Mar. 1976), Certified Index to Record [hereinafter C.I.R.] Doc. 10.

21. EPA Transportation Equipment Noise Emission Controls, 40 C.F.R. § 205 (1979).

22. See note 17 supra and accompanying text.

23. 40 C.F.R. § 205.50(a) (1979), App. 9 (coverage section of subpart B, governing medium and heavy trucks). The section reads:

Except as otherwise provided for in these regulations the provisions of this subpart apply to any vehicle which has a gross vehicle weight rating (GVWR) in excess of 10,000 pounds, which is capable of transportation of property on a highway or street and which meets the definition of the term "new product" in the Act.

24. RVIA requested that in the event the regulations were held to be applicable to motor homes, EPA reconsider their inclusion. RVIA also asked that if the regulations were intended to exclude motor homes, the agency amend the regulations to make the exclusion unambiguous. See Petition for Reconsideration of RVIA Regarding the Regulation of the Environmental Protection Agency Entitled Transportation Equipment Noise Emission Controls—Medium and Heavy Duty Trucks, submitted to EPA, Office of Noise Abatement and Control, Doc. ONAC 74–1 (May 13, 1976).

25. Exclusive jurisdiction to review EPA's promulgation of noise emission standards under § 4905 of the Act is vested in this court. 42 U.S.C. § 4915(a) (1976). See Outdoor Power Equip. Inst., Inc. v. EPA, 438 F.Supp. 1092, 1093–1096 (D.D.C.1978) (§ 4915(a) divests district courts of federal-question jurisdiction to review EPA identification of a product as a "major source of noise" under § 4904). Chrysler and others also challenged the proposed regulations, but on a much broader scale. See Chrysler Corp. v. EPA, 195 U.S.App.D.C. 90, 92, 600 F.2d 904, 906 (1979). We severed from that litigation the motor home issue—raised only by Chrysler—consolidated it for consideration on the merits with RVIA's petition, and held the consolidated litigation in abeyance pending EPA's disposition of RVIA's request for administrative reconsideration. See id. at 92, 600 F.2d at 906.

tor homes.[26] After briefing, but prior to oral argument in this court, RVIA sought reconsideration of the decision to include motor homes within the regulations' ambit,[27] and EPA agreed.[28] On August 3, 1977, however, EPA published the results of its reconsideration, and once again refused to exclude motor homes from the regulations.[29] The process of review in this court then resumed.[30]

Petitioners challenge any application of these regulations to motor homes on two grounds. They assert that because EPA did not list motor homes as a major source of noise pursuant to Section 5(b) of the Act,[31] it lacks authority to issue noise emission standards respecting such vehicles under Section 6(a).[32] Petitioners also contend that EPA's decision to bring motor homes within the coverage of the medium and heavy truck regulations[33] was arbitrary

and capricious because it never tested or otherwise studied motor homes per se to determine whether their inclusion was justified.[34] In addition to resisting these claims, EPA argues that this court lacks jurisdiction to consider RVIA's petition for review because it was filed more than 90 days after promulgation of the regulations in suit.[35] We address the jurisdictional question first,[36] and then the issues on the merits.[37]

## II. JURISDICTION

EPA renews the contention this court earlier rejected in denying the agency's motion to dismiss RVIA's petition for untimeliness.[38] EPA asserts that because RVIA waited until September 20, 1976, to come forth with its petition to review regulations promulgated 160 days earlier on April 13, 1976, it failed to comply with the Act's requirement[39] that review petitions be filed

---

**26.** The agency also denied RVIA's request for exclusion of such vehicles from coverage by the standards. See Letter from J. Quarles, Deputy Administrator, EPA, to Maurice H. McBride, counsel for RVIA, App. II 81.

**27.** See 44 Fed.Reg. 45624 (1979); Letter from Maurice H. McBride, counsel for RVIA, to Thomas A. Pursley, III, Department of Justice (Oct. 20, 1977) Certified Index to the Record of EPA's Denial of RVIA's Petition for Reconsideration [hereinafter C.I.R. II] Doc. 11.

**28.** 42 Fed.Reg. 59975 (1977).

**29.** 44 Fed.Reg. 45624–45625 (1979).

**30.** Operation of the regulations has been continuously stayed, first by EPA during reconsideration, 42 Fed.Reg. 59975 (1977), and then by this court pending review, *Recreation Vehicle Indus. Ass'n v. EPA*, No. 76–1875 (D.C.Cir., Aug. 30, 1979).

**31.** See text *supra* at note 16.

**32.** See Brief for Petitioner RVIA at 19–28; Brief for Petitioner Chrysler at 38–40. RVIA also contends that the regulations as applied to motor homes are defective because not in compliance with § 5(b)(2). See Brief for Petitioner RVIA at 29–32 and note 62 *infra*.

**33.** Petitioners are concerned primarily with Type A motor homes, which are built on stripped truck chassis purchased from other manufacturers. The motor home manufacturer, by adding an operator's compartment to the chassis, creates a "vehicle" as defined in the

regulations, 40 C.F.R. § 205.51(a)(29) (1979), and therefore must demonstrate compliance with the applicable noise standard through production verification testing, *id.* § 205.55–1(b) (1979). Motor homes in the other two classes, Types B and C, are rarely over 10,000 pounds GVWR; moreover, because those in the latter classes already are completed vehicles when received by the motor home manufacturer, production verification responsibility rests with the first-stage manufacturer. For those Type B or C motor homes that exceed 10,000 pounds GVWR, the motor home manufacturer need only assure that the modifications it makes do not cause the final product to exceed the applicable noise standard. *Id.* § 205.55–1(c) (1979). See 44 Fed.Reg. 45624, 45625 (1979); EPA, Noise Enforcement Division Response to Enforcement Issues Raised by RVIA, 2 n.* (memorandum Nov. 7, 1978), C.I.R. II Doc. 8.

**34.** See Brief for Petitioner RVIA at 32–53; Brief for Petitioner Chrysler at 40.

**35.** Brief for Respondent at 7–19. EPA acknowledges that Chrysler's petition for review is properly before the court for consideration. Brief for Respondent at 7.

**36.** See Part II *infra*.

**37.** See Parts III, IV *infra*.

**38.** See *Recreation Vehicle Indus. Ass'n v. EPA*, No. 76–1875 (D.C.Cir. Dec. 9, 1976) (order).

**39.** 42 U.S.C. § 4915(a) (1976).

within 90 days of a challenged regulation's issuance.[40] We explain why this theory is unacceptable.

▮▮▮ Before any litigant reasonably can be expected to present a petition for review of an agency rule, he first must be put on fair notice that the rule in question is applicable to him. Otherwise the agency could promulgate a confusing regulation and, after expiration of the time for any judicial contest, clarify it to the surprise and prejudice of a party whose opportunity for judicial review meanwhile has been extinguished.[41] Here, for a considerable period, EPA left unclear the applicability of its truck regulations to the motor home industry. The agency cannot now take advantage of the obscurity of intentions in order to defeat rights statutorily conferred.

Pursuant to its obligations under Section 5(b) of the Act, EPA published a list of major sources of noise, including medium and heavy trucks, without mention of motor homes *eo nomine*.[42] Later, the agency published a notice of intended rulemaking and specifically referred to motor homes as subject to the proposed noise emission standards.[43] In response, petitioners submitted extensive comments objecting to any such treatment of motor homes and seeking to exclude them from coverage.[44] When adopted in final form, the regulations made no mention whatsoever of motor homes.[45]

EPA argues that because RVIA was an active participant in the rulemaking proceeding, it is disingenuous for it to claim uncertainty about whether the regulations as adopted were applicable to motor homes.[46] We cannot agree. It is true—given the specific reference to motor homes in the October 30, 1974, notice of intended rulemaking—that RVIA had reason to expect that any noise emission standards ultimately promulgated might be directed to motor homes along with medium and heavy trucks generally. But, particularly in light of the subsequent efforts of both RVIA and Chrysler to secure the exemption of motor homes from coverage,[47] we think EPA's total silence on motor homes in the final regulations was sufficiently equivocal to leave RVIA in doubt about whether motor homes were subject to the new standards. Nor was this ambiguity diminished by EPA's modification of the applicability provision of the final regulations to cover vehicles "*capable* of transportation of *property*," rather than those "*designed* for transportation of *persons and property*" as proposed in the notice of rulemaking.[48] On the contrary, elimination of the reference to "persons" could serve only to heighten the uncertainty; for while motor homes are "capable of transportation of property," they are more commonly considered vehicles "designed for transportation of persons."

RVIA's prompt request for agency clarification lends credence to its claim that it was confused about whether the final regulations applied to motor homes. It also signifies RVIA's good faith in bringing the ambiguity to the agency's attention. And the seven months that elapsed between RVIA's bid for elucidation and EPA's response tends to belie the agency's claim that motor homes were "obviously covered" by the final regulations.[49] There simply is no reason to assume that, had the question of coverage been as straightforward as

---

**40.** See Brief for Respondent at 7–19. This is said to be the first time a petition for review of regulations issued under the Noise Control Act has been impugned as untimely. *Id.* at 12.

**41.** See *Sam Rayburn Dam Elec. Coop. v. FPC*, 169 U.S.App.D.C. 281, 290, 515 F.2d 998, 1007 (1975), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976).

**42.** See text *supra* at notes 13–16.

**43.** See text *supra* at notes 17–18.

**44.** See text *supra* at notes 19–20.

**45.** See notes 21–23 *supra* and accompanying text.

**46.** Brief for Respondent at 16–17.

**47.** See text *supra* at notes 19–29.

**48.** See notes 18, 23 *supra* and accompanying text.

**49.** Brief for Respondent at 15.

EPA urges, a much more timely response would not have been forthcoming.

■■ As a general rule, of course, counsel would be wise to file a protective petition for review within the statutory 90-day period, even though a request for clarification is pending before the agency. But we adhere to our previously-announced belief that when an agency leaves room for genuine and reasonable doubt as to the applicability of its orders or regulations, the statutory period for filing a petition of review is tolled until that doubt is eliminated.[50] Thus, since it was not until December 22, 1976, that EPA made clear that the noise emission standards were applicable to motor homes, RVIA had until March 22, 1977, to file its petition for review. Because it did so well within that period,[51] we conclude that we have jurisdiction to proceed to the merits of its claims.

## III. PROCEDURAL COMPLIANCE

Petitioners' first contention is that EPA lacked authority to regulate motor homes because it failed to include such vehicles on its published list of major sources of noise.

As previously noted,[52] the Act requires the Administrator to "publish a report identifying products (or *classes* of products) which in his judgment are major sources of noise."[53] This the agency did, and its June 21, 1974, notice labeled medium and heavy trucks as major noise offenders.[54] It is true, as RVIA says, that the words "motor home" nowhere appeared in the notice.[55] But it also is true that the Section 5(b) listing made no specific reference to fire engines, trash removal vehicles, cement mixers, or the many other specialized vehicles that EPA plainly had in mind.[56]

By designating medium and heavy trucks, EPA sought to deal with a large class of noisy motor vehicles typified by common noise-generating components. The record is clear that the vast majority of motor homes are built on standard truck chassis, which arrive at the motor home manufacturer's plant with an engine, exhaust system, cooling system, and power train—the major sources of noise[57]—already installed.[58] RVIA has consistently maintained that manufacturers rarely modify any of these mechanical systems when they attach a motor home body to the truck

---

50. See *Sam Rayburn Dam Elec. Coop. v. FPC,* supra note 41, 169 U.S.App.D.C. at 290, 515 F.2d at 1007.

51. RVIA filed its petition for review on September 20, 1976, prior to EPA's response to RVIA's petition for clarification. Thus, not only was the September filing understandable, given EPA's delay in acting on that request, but it also was timely.

52. See text *supra* at note 9.

53. 42 U.S.C. § 4904(b) (1976) (emphasis supplied). Because the Act requires only that the Administrator consult with appropriate federal agencies before listing products as major noise sources, *id.,* Congress clearly left the identification of noise sources to the agency's informed discretion. Congress rejected the Senate's version, which would have required designation under Section 5(b) "on the basis of information available to [the Administrator]." S. 3342, § 407(b)(2), printed in S.Rep.No. 92–1160, reprinted in Senate Committee on Public Works, Legislative History of the Noise Control Act of 1972, 93d Cong., 2d Sess. 285 (Comm. Print No. 92–23) [hereinafter cited as *Legislative History*]. The House substituted the text ultimately adopted for that of the Senate, 118 Cong.Rec.

37075–37088 (1972), reprinted in *Legislative History, supra,* at 67–68, and later the Senate concurred. 118 Cong.Rec. 37319 (1972), reprinted in *Legislative History, supra,* at 23–42. Representative Staggers explained that the substitution was intended to "insure[ ] that all interested parties—regulatory agencies, industry, and the public—will bring together their special qualities to free the American public from ... noise pollution." 118 Cong.Rec. 37088 (1972), reprinted in *Legislative History, supra,* at 78. Thus, to make sense of the substitution we have little to guide us other than the language itself and Congress' expressed desire to control noise pollution in a nonarbitrary manner.

54. See note 15 *supra* and accompanying text.

55. See 39 Fed.Reg. 22297–22298 (1974).

56. See *id.*

57. See 39 Fed.Reg. 22297–22299 (1974), App. II 53–55.

58. See, *e. g.,* Public Comments Submitted by Recreation Vehicle Industry Association at 2 (Dec. 31, 1974) C.I.R. Doc. 139.

chassis.[59] Given the virtually identical structural design of chassis for motor homes and trucks, EPA certainly was free to consider motor homes part of the *class* denominated medium and heavy trucks.

■ Chrysler, on the other hand, represents that the motor home chassis it manufactures are sufficiently different from its truck chassis to call for their own set of standards.[60] But we cannot say that EPA abused its discretion in initially including all motor homes as a type of medium or heavy truck for purposes of its Section 5(b) notice. We know of nothing requiring EPA to promulgate separate regulatory codes for every individual subclass of medium and heavy trucks given the similarities in their noise producing characteristics.[61] Accordingly, we must reject petitioners' contention that EPA's failure to single out motor homes as a major source of noise pursuant to Section 5(b) barred the agency from pro-

mulgating noise emission control standards for such vehicles under Section 6(a) of the Act.[62]

## IV. SUBSTANTIVE COMPLIANCE

There remains the contention that EPA acted arbitrarily in applying to motor homes regulations aimed at controlling noise emitted by medium and heavy trucks. Two arguments have been advanced to support this claim. RVIA asserts that because EPA failed to study the "magnitude and conditions of use" of motor homes, "the degree of noise reduction achievable," and the "cost of compliance" to motor home manufacturers, all as required by Section 6(c) of the Act,[63] the agency has no basis upon which to support its subjection of motor homes to the truck regulations.[64] More particularly, RVIA argues that the regulations as adopted unfairly impose upon its

**59.** *Id.* at 3; RVIA Memorandum of Points and Authorities in Support of Motion for Stay at 11 (filed Aug. 15, 1979).

**60.** See Brief for Petitioner Chrysler at 40, B1–B3; notes 82–83 *infra* and accompanying text.

**61.** Chrysler asserted at oral argument that EPA's failure to identify motor homes as a major source of noise deprived it of adequate notice of the agency's intention to regulate motor homes pursuant to § 6(a). The October 30, 1974, notice of proposed rulemaking at the very least alerted manufacturers to the distinct possibility that motor homes might be deemed medium or heavy trucks. See note 18 *supra*. Furthermore, Chrysler submitted extensive comments during the rulemaking proceeding. See note 19 *supra*. We think Chrysler had ample opportunity to participate intelligently in the agency's § 6(a) rulemaking process.

**62.** We similarly reject RVIA's argument that EPA's failure to publish information on technology, costs and alternative methods of noise control of motor homes under § 5(b)(2), 42 U.S.C. § 4904(b)(2) (1976), deprived the agency of authority to regulate motor homes. See Brief for Petitioner RVIA at 29–32. ·EPA published a § 5(b)(2) report dealing with medium and heavy trucks, Medium and Heavy Duty Trucks Technology and Cost Information, EPA 550/9–74–015 (Sept. 1974), C.I.R. Doc. 18, which is all that § 5(b)(2) requires.

Although it is true that a report commissioned by EPA to assist it in complying with its obligations under § 5(b)(2) expressly excluded motor homes from the scope of its analysis, see

A. T. Kearney, Inc., *A Study to Determine the Economic Impact of Noise Emission Standards in the Medium and Heavy Duty Truck Industry,* Draft Report (Apr. 1974), C.I.R. Doc. 11, I–2, Addendum to Brief for Petitioner RVIA at 58, we are not persuaded that the final regulations were rendered defective thereby. The Act directs the Administrator, after "consult[ation] with appropriate Federal agencies," to compile a report on technology, costs and alternative methods of noise control for products identified as major sources of noise. 42 U.S.C. § 4904(b)(2) (1976). Nothing beyond consultation with other federal agencies is statutorily required before EPA issues such reports. Thus, while EPA's requisition of a study of the noise levels of medium and heavy trucks prior to issuing its § 5(b)(2) report was an additional and wholesome safeguard, it was not a step required by the Act. However the Kearney Report's exclusion of motor homes may bear upon the legality of subjecting them to the regulations applicable to medium and heavy trucks, see Part IV *infra,* it cannot be deemed procedurally fatal to the final regulation.

Because we conclude that EPA was empowered by § 6(a) to regulate motor homes, we do not reach the agency's alternative argument that it had independent authority to regulate such vehicles pursuant to § 6(b), 42 U.S.C. § 4905(b) (1976). See Brief for Respondent at 26–27.

**63.** 42 U.S.C. § 4905(c) (Supp. III 1979).

**64.** See Brief for Petitioner RVIA at 32–53.

member manufacturers the expense of bringing motor homes into compliance with the truck standards when it is the chassis—which they do not manufacture—that is the major source of noise.[65] Chrysler, on the other hand, asserts, apparently for the first time, that the unique design characteristics of the chassis it manufactures for the motor homes it assembles make application of the truck regulations to its motor homes unjustifiable.[66] Chrysler says, in essence, that its motor homes simply are not trucks, and should be governed, if at all, only by regulations promulgated specifically for its products.

As we have observed, EPA reconsidered the inclusion of motor homes in its medium and heavy truck regulations in light of the arguments advanced in RVIA's second petition for reconsideration.[67] RVIA contended therein that because the regulations required motor home manufacturers to shoulder the entire technical and economic burden of bringing motor homes, including the chassis, into compliance with the new standards—a burden many of its smaller members allegedly could not bear—the regulations as applied were arbitrary.[68] After reconsideration, however, EPA again concluded that application of the regulations to motor homes was reasonable.[69]

■ At our request, EPA has submitted for our review the record on which it based that decision, as well as a memorandum specifying those items in the record upon which it primarily relied. The manufactur-ers, at our invitation, have responded, and we accordingly have examined RVIA's claims as thus illuminated. We find adequate support in the record as a whole for EPA's decision to hold motor home manufacturers responsible for bringing their products into compliance with the noise emission control standards prescribed for medium and heavy trucks.

EPA predicated its action on two grounds. First, it found that because the vast majority of motor home chassis are identical or substantially similar to chassis incorporated into other vehicles that have been shown to meet the noise standards, motor home manufacturers have ready access to chassis to which noise-attenuation technology already has been applied.[70] Moreover, in view of the truck industry's growing expertise in noise reduction and the consequent availability of such devices as thermostatically controlled fans, better mufflers, and other noise-attenuation equipment of relatively low cost, EPA further found that the degree of noise reduction achievable was such that bringing motor homes into compliance with the noise standards was neither impracticable nor unduly burdensome.[71]

Second, although acknowledging that the regulations do in fact place upon the motor home manufacturer, rather than the chassis manufacturer, the burden of demonstrating compliance through production verification testing,[72] EPA found that the cost of such testing is small.[73] After noting the high degree of standardization among motor

---

**65.** RVIA focused almost exclusively on this aspect of its challenge at oral argument.

**66.** See Brief for Petitioner Chrysler at 40.

**67.** See text *supra* at notes 27–29.

**68.** See Letter from Maurice H. McBride, counsel for RVIA, to Jeffrey O. Cerar, EPA Office of General Counsel (Sept. 20, 1977), C.I.R. Doc. 10.

**69.** 44 Fed.Reg. 45624, 45625 (1979).

**70.** *Id.* at 45624–45625.

**71.** *Id.* at 45625.

**72.** The Administrator stated:

RVIA is correct that the Type A motor home manufacturer is responsible for demonstrating compliance with the regulation through required testing. The regulation requires that the manufacturer of a "vehicle," as defined in the regulation, demonstrate compliance with the noise standard through production verification testing, the testing of a representative product from early production. By adding an operator's compartment to the purchased chassis, the Type A motor home manufacturer creates a "vehicle" as defined by the regulation, and is responsible for production verification testing.

See note 33 *supra*.

**73.** 44 Fed.Reg. 45624–45625 (1979).

home chassis, EPA also found that most home manufacturers will have to perform a maximum of only four production verification tests per year, far fewer than .most manufacturers of other truck-type vehicles.[74] The agency further found that although some motor home manufacturers are located many miles from established noise-testing facilities, numerous truck manufacturers have performed valid production verification testing in large parking lots or on local airport runways using relatively inexpensive sound measurement equipment, and thus that similar testing could be performed as easily and inexpensively by motor home manufacturers.[75] Accordingly, EPA concluded that the compliance expense for motor home manufacturers not only is reasonable but also compares favorably to that of other truck manufacturers.

Our task is to determine "whether the [agency] decision was based on a consideration of relevant factors[,] . . . whether there has been a clear error of judgment,"[76] and whether the agency has fulfilled its obligation to "articulate a 'rational connection between the facts found and the choice made.' "[77] We are not at liberty either to supply a rationale of our own [78] or to accept an after-the-fact justification for the agency's action.[79] But where, as here, the agency has voluntarily conducted post-rulemaking proceedings in an effort to cure alleged defects, we are loathe to require it to repeat every step in the administrative process merely because its initial action may have been partially flawed. Here, albeit after the regulations at issue were promulgated, EPA fully considered the relevant factors [80] and made a reasoned decision

---

**74.** *Id.*

**75.** *Id.*

**76.** *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136, 153 (1971). See also 5 U.S.C. § 706(2)(A) (1976); *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 803, 98 S.Ct. 2096, 2116, 56 L.Ed.2d 697, 719 (1978); *Citizens to Save Spencer County v. EPA,* 195 U.S.App.D.C. 30, 75, 600 F.2d 844, 889 (1979); *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 405–409 & nn. 69–78, 541 F.2d 1, 33–73 & nn. 69–78 (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

**77.** *Bowman Transp. Corp. v. Arkansas-Best Freight Sys.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 456 (1974), quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962).

**78.** We may uphold a decision of "less than ideal clarity," *Bowman Transp. Corp. v. Arkansas-Best Freight Sys., supra* note 77, 419 U.S. at 285–286, 95 S.Ct. at 442, 42 L.Ed.2d at 456, citing *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206, 1219 (1945), but not a decision for which no rationale at all has been advanced. *SEC v. Chenery Corp. (Chenery II),* 332 U.S. 194, 196–197, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947); *United States v. Chicago, M. St. P. & P. R. R. Co.,* 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 S.Ct. 1023, 1032 (1935). See *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36

L.Ed.2d 106, 111 (1973); *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943); *Sierra Club v. EPA,* 176 U.S.App.D.C. 335, 345 n.26, 540 F.2d 1114, 1124 n.26 (1976), vacated and remanded on other grounds, 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 204 (1977); *National Ass'n of Food Chains, Inc. v. ICC,* 175 U.S.App.D.C. 346, 352, 535 F.2d 1308, 1314 (1976); *Ace Motor Freight, Inc. v. ICC,* 181 U.S.App.D.C. 236, 241, 557 F.2d 859, 864 (1977); *Office of Communication of United Church of Christ v. FCC,* 191 U.S.App.D.C. 360, 367, 590 F.2d 1062, 1069 (1978).

**79.** *Tabor v. Joint Bd. for Enrollment of Actuaries,* 185 U.S.App.D.C. 40, 45, 566 F.2d 705, 710 (1977); *KIRO v. FCC,* 178 U.S.App.D.C. 126, 130, 545 F.2d 204, 208 (1976); *SEC v. Chenery Corp., supra* note 78, 318 U.S. at 95, 63 S.Ct. at 462, 87 L.Ed. at 637.

**80.** See text *supra* at notes 70–75. Previously, EPA had considered the magnitude and conditions of use of motor homes in assessing the public benefit to be achieved by subjecting them to regulatory control. See 1976 Background Document, *supra* note 23, at A–3–21. RVIA challenges EPA's estimated percentage of noise pollution contributed by motor homes within the medium and heavy truck category, and the agency's conclusion in reliance thereon that regulation of motor homes would benefit the public. See Brief for Petitioner RVIA at 48–52. We find the record sufficiently supportive of EPA's findings to insulate them from reversal on these grounds.

based upon substantial evidence.[81] Even though part of the record underpinning that decision was compiled subsequent to adoption of the regulations, we think any defect previously existent was cured and that a remand merely for the sake of procedural formality would serve no useful purpose.

 We are mindful of Chrysler's complaint that its motor home chassis are so significantly different from the truck chassis it manufactures as to make application of the truck noise emission standards to its motor homes unreasonable. But we have not been referred to, nor have we found, anything in the record showing that this objection was raised either during the rulemaking proceeding or in a timely-filed petition for reconsideration. This contention goes to the heart of the findings underlying EPA's decision to make the truck regulations applicable to motor homes,[82] and had Chrysler brought its present thesis to EPA's attention either during the comment period of the rulemaking process or in a petition for reconsideration, the agency would have been obliged to justify application of the standards to Chrysler's motor homes. Having failed to do so, however, Chrysler is not now entitled to have the record remanded for agency consideration on that score. Accordingly, we also affirm EPA's decision to apply the regulations to Chrysler's motor homes.

*So ordered.*

**81.** See text *supra* at notes 70–75. That EPA did not perform noise testing on motor homes themselves does not affect the result. EPA did test a sampling of medium and heavy trucks for noise, 39 Fed.Reg. 22297, 22298 (1974), App. II 54. See Background Document for Proposed Medium and Heavy Truck Noise Regulations (Oct. 1974), C.I.R. Doc. 9, and, given the close similarities in the noise-producing components of standardized truck chassis on which medium and heavy trucks—including the vast majority of motor homes—are built,

see text *supra* at notes 57–59, that was sufficient to negate any notion of arbitrariness. Unlike Chrysler, see text *infra* at note 82, RVIA does not claim that the chassis its member-manufacturers utilize in their motor homes differ from the general run of truck chassis in any significant way. In such circumstances, the agency was not required to subject every individual subclass of medium and heavy trucks to separate noise testing.

**82.** See text *supra* at notes 57–59.